469 F.3d 219
 Jose Raimundo MADEIRA, Plaintiff-Appellee,
v.
AFFORDABLE HOUSING FOUNDATION, INC., and Mountain Developers Associates, LLC, Defendants-Third-Party-Plaintiffs-Appellees-Cross-Appellants,
Preferred National Insurance Co., Third-Party-Defendant-Appellee,
v.
Cleidson C. Silva, Doing Business As C & L Construction, Third-Party-Defendant-Appellant-Cross-Appellant.
 Docket No. 04-3606-cv(L).
 Docket No. 04-3700-cv(XAP).
 United States Court of Appeals, Second Circuit.
 Argued: May 10, 2005.
 Decided: November 14, 2006.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Garth S. Wolfson, Cornelius A. Mahoney, Mahoney & Keane, LLP, and Ginarte, O'Dwyer & Winograd, New York, NY, for Plaintiff-Appellee Jose Raimundo Madeira.
 Donald J. Feerick, Jr., New City, NY, for Defendant-Third-Party-Plaintiff-Appellee-Cross-Appellant Mountain Developers Associates, LLC.
 Dennis Lynch, Dorfman, Lynch & Knoebel, Nyack, NY, for Defendant-Third-Party-Plaintiff-Appellee-Cross-Appellant Affordable Housing Foundation, Inc.
 Joseph M. Glatstein, Williamson & Williamson, P.C., New York, NY, for Third-Party Defendant-Appellee Preferred National Insurance Co.
 David Samel, Jeffrey Samel & Partners, New York, NY, for Third-Party-Defendant-Appellant-Cross-Appellant Cleidson C. Silva, d/b/a C & L Construction.
 Before FEINBERG, WALKER, and RAGGI, Circuit Judges.
 RAGGI, Circuit Judge.
 
 
 1
 Cleidson C. Silva, doing business as C & L Construction ("C & L"), Affordable Housing Foundation, Inc. ("Affordable"), and Mountain Developers Associates, LLC ("Mountain"), appeal from a final judgment entered on May 7, 2004, after a jury trial, at which plaintiff Jose Raimundo Madeira, an undocumented alien worker, was awarded compensatory damages for lost earnings, as well as out-of-pocket expenses and pain and suffering, as the result of physical injuries attributable to defendants' violation of New York Labor Law § 240(1). Defendants Affordable and Mountain had unsuccessfully moved in the district court for judgment notwithstanding the verdict on the award of lost earnings. See Madeira v. Affordable Hous. Found., Inc., 315 F.Supp.2d 504, 506-10 (S.D.N.Y.2004). They argued below that federal immigration law, as articulated in the Immigration Reform and Control Act of 1986 ("IRCA"), Pub.L. No. 99-603, 100 Stat. 3359, codified as amended in scattered sections of 8 U.S.C., and as interpreted by the Supreme Court in Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. 137, 122 S.Ct. 1275, 152 L.Ed.2d 271 (2002), necessarily precluded any damages award under New York law that compensated an undocumented worker for lost earnings, at least to the extent such earnings were based on pay rates in the United States rather than in the worker's native country. In pursuing this same argument on appeal, Affordable and Mountain are now joined by third-party defendant Silva.
 
 
 2
 In addition, Affordable and Mountain appeal district court rulings allowing the jury to apportion liability among C & L, Affordable, and Mountain; precluding evidence regarding C & L's lack of insurance; and dismissing their third-party action against Preferred National Insurance Company ("Preferred"). Silva further appeals the district court's rejection of his Rule 50(b) challenge to the jury verdict obligating him to indemnify Affordable and Mountain, arguing that the document relied on by these third-party plaintiffs to support their indemnification claim is not an enforceable contract.
 
 
 3
 For the reasons discussed herein, we conclude that federal immigration law does not clearly preempt New York State law allowing undocumented workers to recover lost United States earnings where, as in this case, (1) the wrong being compensated, personal injury, is not authorized by IRCA under any circumstance; (2) it was the employer rather than the worker who knowingly violated IRCA in arranging for the employment; and (3) the jury was instructed to consider the worker's removability in deciding what, if any, lost earnings to compensate. Because we conclude that appellants' and cross-appellants' other arguments are also without merit, we affirm the district court judgment in all respects.
 
 I. Factual Background
 
 4
 In recounting the facts relevant to this appeal, we necessarily review the record in the light most favorable to the parties in whose favor the jury returned each part of its verdict. See Gronowski v. Spencer, 424 F.3d 285, 291-92 (2d Cir.2005).
 
 A. Madeira's Employment and Injury
 
 5
 Plaintiff Jose Raimundo Madeira[1] is a citizen of Brazil who illegally entered the United States in 1998. In Brazil, Madeira had worked in a factory earning approximately $175 per month; he had also labored briefly on his parents' farm without formal remuneration. In the United States, Madeira fared better, working consistently as a construction laborer, largely through the efforts of his brother, Paulo Miranda. As a supervisor for C & L, Miranda had authority to hire workers to perform that party's subcontracts. In the years prior to the accident here at issue, Madeira was earning approximately $15 per hour in the United States and working as many as 50 hours per week.
 
 
 6
 Nothing in the trial record indicates that Madeira himself used any false identification to obtain work in the United States; such action was apparently unnecessary given his brother's willingness to hire him despite knowing Madeira's undocumented status. Moreover, because Miranda acted as C & L's agent in hiring workers, his knowledge of Madeira's undocumented status can be imputed to his principal, C & L. Although Madeira was generally paid in cash for his work, he testified that he paid income taxes on his earnings by using a taxpayer identification number. No evidence was adduced to the contrary. Madeira further stated that, sometime in 2000, he attempted to legitimize his work status by applying for a Social Security card and work permit but, at the time of trial in 2004, those applications had not yet been acted on.
 
 
 7
 On June 20, 2001, while working as a roofer for C & L, Madeira fell from the top of a building at a development site in Monroe, New York, sustaining serious injuries that required four surgeries and more than three months' hospitalization. At the time of trial, Madeira was still substantially disabled, particularly in walking.
 
 B. The Southern District Lawsuit
 
 8
 Following his accident, Madeira invoked federal diversity jurisdiction to file suit in the Southern District of New York against Affordable, the owner of the construction site, and Mountain, the development's general contractor, for their alleged failure to provide adequate safety equipment at the work site in violation of New York's "Scaffold Law," N.Y. Labor Law § 240(1).[2] In turn, Affordable and Mountain filed a third-party action for indemnification against Madeira's employer, C & L, as well as against C & L's insurer, Preferred. The suit proceeded to a bifurcated trial, with the jury first deciding Madeira's § 240(1) claim and then considering Affordable and Mountain's demand for indemnification.
 
 
 9
 1. The Jury's Determination of § 240(1) Liability and Damages
 
 
 10
 In the first phase of trial, the jury heard testimony from Madeira; his brother Miranda who, in addition to hiring Madeira for the job, had witnessed the accident; and Jacob Sofer, the president of both Affordable and Mountain. A "vocational rehabilitation counselor" also testified on plaintiff's behalf, offering his opinion as to Madeira's dim prospects for future employment in either the United States or Brazil in light of his disability. The counselor expressed no opinion as to how Madeira's immigration status might have affected his employability in this country if he had not been injured. Nor did the defense offer any evidence indicating if or when Madeira might be required to leave the United States. The parties did, however, present conflicting medical opinion testimony about the extent of Madeira's injuries.
 
 
 11
 Following the close of the evidence, the district court instructed the jury that it was not to consider Madeira's immigration status in assessing Affordable's and Mountain's liability under Labor Law § 240(1). Nevertheless, the jury was allowed to consider plaintiff's undocumented work status in awarding any compensatory damages for lost earnings. Specifically, the court charged:
 
 
 12
 Plaintiff's status as an undocumented alien should not be considered by you when you deliberate on the issue of defendant[s'] liability under Labor Law Section 240(1). However, you may conclude that plaintiff's status is relevant to the issue of damages, specifically to the issue of lost wages which the plaintiff is claiming. You might consider, for example, whether the plaintiff would have been able to obtain other employment since as a matter of law, it is illegal for an employer in the United States to employ an undocumented alien, although of course it does happen that certain employers violate that law. If the plaintiff did not lose any income because you conclude that he would not have been able to work, and I mean not been able to work due to his alien status, you could not award him any damages for lost wages. You might also want to consider his status in determining the length of time he would continue to earn wages in the United States and in considering the type of employment opportunities that would be available to him. The fact that an alien is deportable does not mean that deportation will actually occur, but you are allowed to take the prospect of deportation into account in your deliberations.
 
 
 13
 Finally, even if you conclude that the plaintiff would be deported at some point, you could conclude that he would lose income from employment overseas if you have a basis for making that calculation. In short, it's up to you, the jury, to decide what weight, if any, to give plaintiff's alien status just as you would any other evidence. Alien status is not relevant to items of damage other than lost earnings.
 
 
 14
 Trial Tr. 462-63.
 
 
 15
 The jury proceeded to find both Affordable and Mountain liable under Labor Law § 240(1). It awarded Madeira $638,671.63 in total compensatory damages, consisting of $92,651.63 in incurred expenses; $46,000 for past pain and suffering; $40,020 in past lost earnings; $230,000 for future pain and suffering (over the course of forty-two years); and $230,000 for future lost earnings (over the course of twenty-six years). Only the past and future lost earnings awards are at issue on this appeal. From the fact that the future lost earnings award represents far more than Madeira would likely have earned in Brazil in the specified twenty-six years,[3] but considerably less than he could have earned in the United States over the same time,[4] one can reasonably infer that the jury concluded that, but for his injury, Madeira would have remained and worked in the United States, but only for a limited period.[5]
 
 2. The Jury Findings on Indemnification
 
 16
 In the second phase of the trial, the jury found that an enforceable contract existed between C & L on the one hand and Affordable and Mountain on the other, requiring C & L to indemnify Affordable and Mountain for so much of the compensation award as stemmed from C & L's own negligence. As required by that contract, the jury apportioned liability for Madeira's injuries, holding C & L 82% liable and Mountain and Affordable each 9% liable.
 
 C. Post-Verdict Rule 50(b) Motions
 
 17
 Following the indemnification verdict, Affordable, Mountain, and Silva all moved for relief pursuant to Federal Rule of Civil Procedure 50(b). Affordable and Mountain moved for judgment notwithstanding the verdict on four grounds: (1) Madeira was precluded from recovering lost earnings by the fact that, at the time of his accident, he was not legally eligible to work in the United States; (2) liability could not be apportioned among C & L, Affordable, and Mountain because the jury did not find, in the first phase of the trial, that Affordable and Mountain were negligent; (3) the district court erred in precluding Affordable and Mountain from presenting proof regarding C & L's lack of insurance; and (4) the district court erred in dismissing Affordable's and Mountain's third-party action against Preferred. Meanwhile, Silva moved for a new trial, arguing that (5) no enforceable contract existed requiring C & L to indemnify Affordable and Mountain for losses resulting from Madeira's personal injuries.
 
 
 18
 The district court denied all post-verdict motions in a detailed memorandum and order dated April 22, 2004. See Madeira v. Affordable Hous. Found., Inc., 315 F.Supp.2d 504. Silva, Affordable, and Mountain now appeal the district court's Rule 50(b) rulings as well as its final judgment.[6] In doing so, Silva joins Affordable and Mountain in arguing that Madeira, as an undocumented alien, was not entitled to recover lost earnings, at least not at United States pay rates.
 
 II. Discussion
 A. Standard of Review
 
 19
 We review de novo a district court's denial of a post-verdict motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b). See Armstrong v. Brookdale Univ. Hosp. & Med. Ctr., 425 F.3d 126, 133 (2d Cir. 2005). In so doing, we apply the "same standard as the district court itself was required to apply." Diesel v. Town of Lewisboro, 232 F.3d 92, 103 (2d Cir.2000). Specifically, we consider the evidence in the light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences that the jury might have drawn in its favor. See id. (noting that reviewing court cannot itself "assess the weight of conflicting evidence, pass on the credibility of witnesses, or substitute [its] judgment for that of the jury"). On such a deferential review of the record, we will reverse the denial of a disappointed litigant's motion for judgment as a matter of law "`only if there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against [the moving party].'" Id. (quoting LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 429 (2d Cir.1995) (alteration in original)). That is not this case.[7]
 
 
 20
 B. Federal Immigration Law Does Not Clearly Preempt New York State Law Allowing Undocumented Workers Injured in Construction Accidents To Recover Compensatory Damages for Lost United States Earnings
 
 
 21
 In reviewing the joint challenge raised by Affordable, Mountain, and Silva to the damages awarded Madeira in the district court's final judgment, we note at the outset that no party here disputes the fact of Madeira's injury, the jury's findings as to the relative degree of each party's negligence, or Madeira's right to be compensated for incurred expenses and past and future pain and suffering. Instead, Affordable, Mountain, and Silva (referred to collectively as "appellants" for purposes of their damages challenge) dispute only Madeira's recovery of lost earnings. They submit that the Supreme Court's decision in Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. 137, 122 S.Ct. 1275, 152 L.Ed.2d 271, required the district court to conclude that federal immigration law prohibiting the employment of undocumented aliens precludes state tort or labor law from awarding an injured undocumented worker such as Madeira compensatory damages for lost earnings at United States pay rates. Appellants submit that, if an injured undocumented worker can recover any lost earnings, it is only at the rates he could have earned in his native country.
 
 
 22
 In fact, the New York Court of Appeals this year rejected a similar Hoffman Plastic-based challenge to an undocumented alien's recovery of lost United States earnings pursuant to Labor Law § 240(1). See Balbuena v. IDR Realty LLC, 6 N.Y.3d 338, 812 N.Y.S.2d 416, 845 N.E.2d 1246 (2006).[8] The court observed that the state legislature intended the Scaffold law to protect "all workers in qualifying employment situations — regardless of immigration status." Id. at 358, 812 N.Y.S.2d at 427, 845 N.E.2d 1246. The Court specifically noted that, in Balbuena, as opposed to Hoffman Plastic, the undocumented aliens had not themselves violated federal immigration law in procuring employment. See id. Further, the Court of Appeals noted that New York law for compensating personal injury specifically sought to avoid any conflict with federal immigration law by instructing juries to consider the fact of a plaintiff's removability in determining what, if any, lost United States earnings should be compensated. See id. at 362, 812 N.Y.S.2d 416, 845 N.E.2d 1246, 812 N.Y.S.2d at 429, 845 N.E.2d 1246.
 
 
 23
 New York's highest court's construction of the scope of recovery allowed by its own state law plainly controls this court's reading of that law. See Commissioner v. Estate of Bosch, 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967); Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1190 (2d Cir.1992).[9] Nevertheless, because federal preemption of state law is itself a federal question, Balbuena's reasoning and conclusion on that issue can only inform, not bind, our resolution of this appeal. Accordingly, although we reference Balbuena's reasoning in this opinion, we do so in the context of independently deciding whether IRCA, as enacted by Congress and as interpreted by the Supreme Court in Hoffman Plastic, necessarily preempts New York law to the extent the state allows injured undocumented workers to recover compensatory damages for lost earnings at United States pay rates. We conclude that where, as in this case, (1) the wrong being compensated is personal injury, conduct not authorized by IRCA; (2) it was the employer and not the worker who violated IRCA by arranging for employment; and (3) the jury was instructed to consider the worker's removability in assessing damages, New York law does not conflict with federal immigration law or policy in allowing an injured worker to be compensated for some measure of lost earnings at United States pay rates.
 
 1. The Relevant State and Federal Laws
 
 24
 We begin by considering the state and federal laws relevant to appellants' lost earnings challenge.
 
 
 25
 a. Compensating Personal Injury Under New York Labor Law § 240(1)
 
 
 26
 It is well established that the states enjoy "broad authority under their police powers to regulate ... employment relationship[s] to protect workers within the State." De Canas v. Bica, 424 U.S. 351, 356, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976); accord Balbuena v. IDR Realty LLC, 6 N.Y.3d at 358, 812 N.Y.S.2d at 426, 845 N.E.2d 1246. This includes "the power to enact `laws affecting occupational health and safety.'" Balbuena v. IDR Realty LLC, 6 N.Y.3d at 358, 812 N.Y.S.2d 416, 845 N.E.2d 1246 (quoting De Canas v. Bica, 424 U.S. at 356, 96 S.Ct. 933). Pursuant to this power, New York, like many states, has enacted various laws to compensate workers who sustain workplace injuries.
 
 
 27
 Most obviously, New York's Workers' Compensation Law requires employers to "pay or provide compensation [to employees] for their disability or death from injury arising out of and in the course of the employment without regard to fault as a cause of the injury." N.Y. Workers' Comp. Law § 10(1). This "statute was designed to provide a swift and sure source of benefits to the injured employee." O'Rourke v. Long, 41 N.Y.2d 219, 222, 391 N.Y.S.2d 553, 556, 359 N.E.2d 1347 (1976). "The price for these secure benefits is the [employee's] loss of the common-law tort action [against his employer] in which greater benefits might be obtained." Id.[10]
 
 
 28
 New York does not, however, rely only on workers' compensation awards to promote workplace safety and compensate injury. Mindful of the particular dangers of construction work, the state has long imposed absolute liability for personal injury on those site owners and general contractors who fail to provide adequate safety equipment to all persons working at construction sites. See N.Y. Labor Law § 240(1); Abbatiello v. Lancaster Studio Assocs., 3 N.Y.3d 46, 50, 781 N.Y.S.2d 477, 479, 814 N.E.2d 784 (2004) (noting that law "imposes absolute liability on owners and contractors for any breach of statutory duty that proximately causes injury"). This liability applies regardless of the fact that the injured worker may be in the direct employ of a party other than the defendant contractor or owner. See Abbatiello v. Lancaster Studio Assocs., 3 N.Y.3d at 50-51, 781 N.Y.S.2d at 479-80, 814 N.E.2d 784. As the New York Court of Appeals recently explained, Labor Law § 240(1) seeks to place "ultimate responsibility for safety practices at building construction sites where such responsibility actually belongs, on the owner and general contractor, instead of on workers, who are scarcely in a position to protect themselves from accident." Balbuena v. IDR Realty LLC, 6 N.Y.3d at 358, 812 N.Y.S.2d at 427, 845 N.E.2d 1246 (internal quotation marks and citation omitted); see also Abbatiello v. Lancaster Studio Assocs., 3 N.Y.3d at 50, 781 N.Y.S.2d at 479, 814 N.E.2d 784.
 
 
 29
 New York law not only holds site owners and general contractors absolutely liable for personal injuries resulting from a violation of Labor Law § 240(1); it specifically extends the protections of that law to injured undocumented workers. See Mazur v. Rock-McGraw, Inc., 246 A.D.2d 515, 515, 666 N.Y.S.2d 939, 939 (2d Dep't 1998) (collecting cases); see also Balbuena v. IDR Realty LLC, 6 N.Y.3d at 358, 812 N.Y.S.2d at 427, 845 N.E.2d 1246; Coque v. Wildflower Estates Developers, Inc., 31 A.D.3d 484, 487, 818 N.Y.S.2d 546, 550 (2d Dep't July 11, 2006); Hernandez v. 151 Sullivan Tenant Corp., 30 A.D.3d 187, 188 (1st Dep't June 8, 2006), 2006 N.Y.App. Div. LEXIS 7513, at *2; Ordonez v. Brooklyn Tabernacle, 806 N.Y.S.2d 446 (Sup.Ct. Kings County Aug. 31, 2005), 2005 N.Y. Misc. LEXIS 1854, at *10-11; Echeverria v. Estate of Lindner, 801 N.Y.S.2d 233 (Sup.Ct. Nassau County Mar. 2, 2005), 2005 N.Y. Misc. LEXIS 894, at *32-35.
 
 
 30
 The compensatory damages available under New York law to a worker injured in violation of § 240(1) are those generally recoverable for personal injury, i.e., out-of-pocket expenses, pain and suffering, and lost earnings. See generally United States v. Burke, 504 U.S. 229, 234-35, 112 S.Ct. 1867, 119 L.Ed.2d 34 (1992); Hernandez v. 151 Sullivan Tenant Corp., 30 A.D.3d 187, 188, 2006 N.Y.App. Div. LEXIS 7513, at * 1-2.[11] New York courts have rejected tortfeasors' efforts to limit their liability for lost earnings when the victim sustaining personal injury is an illegal alien. Notably, in Collins v. New York City Health & Hospitals Corp., 201 A.D.2d 447, 448, 607 N.Y.S.2d 387, 388 (2d Dep't 1994), the Appellate Division, Second Department, specifically declined to limit an injured illegal alien's compensatory damages to the earnings he might otherwise have realized in his native country. Instead, recognizing the jury's responsibility to determine compensatory damages from the totality of the circumstances, the court concluded that the jury should factor into any lost earnings award its findings regarding "the length of time during which the [alien plaintiff] might have continued earning wages in the United States," the probability that such earnings "would have been the product of illegal activity,"[12] and "the likelihood of [the plaintiff's] potential deportation." Id.; see Public Adm'r v. Equitable Life Assurance Soc'y, 192 A.D.2d 325, 325-26, 595 N.Y.S.2d 478, 479 (1st Dep't 1993); see also Balbuena v. IDR Realty LLC, 6 N.Y.3d at 362, 812 N.Y.S.2d at 429, 845 N.E.2d 1246 (reaching same conclusion with respect to award of lost earnings to undocumented worker pursuant to Labor Law § 240(1)). The district court's charge to the jury in this case fully comported with these principles of New York law; the only issue for us to decide is whether that law actually conflicts with federal immigration law and policy.
 
 
 31
 b. Discouraging Illegal Immigration through IRCA
 
 
 32
 The federal government exercises supreme power in the field of foreign affairs, including "Immigration, naturalization and deportation." Hines v. Davidowitz, 312 U.S. 52, 62, 61 S.Ct. 399, 85 L.Ed. 581 (1941) ("[T]he supremacy of the national power in the general field of foreign affairs, including power over immigration, naturalization and deportation, is made clear by the Constitution[,] was pointed out by the authors of The Federalist in 1787, and has since been given continuous recognition by this Court." (footnotes omitted)). Illegal immigration, a topic of much recent debate, has long been a subject of federal legislative concern. In 1952, Congress enacted the Immigration and Nationality Act ("INA"), Pub.L. No. 82-414, 66 Stat. 163, codified as amended at 8 U.S.C. §§ 1101-1537, intended as a "comprehensive federal statutory scheme for [the] regulation of immigration and naturalization." De Canas v. Bica, 424 U.S. at 353, 96 S.Ct. 933. Notably, the INA gave little attention to one factor relevant to illegal immigration: employment. See Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 893, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984) (noting that INA did not make it "unlawful for an employer to hire an alien who is present or working in the United States without appropriate authorization" or for "an alien to accept employment after entering this country illegally"). Congress remedied the omission in 1986 when it amended the INA by enacting IRCA.
 
 
 33
 (1) IRCA's Focus on Employer Sanctions
 
 
 34
 Confronting a "large-scale influx of undocumented aliens," Congress concluded that "the most humane, credible and effective way to respond" to the problem was to penalize those employers who hired illegal aliens. H.R.Rep. No. 99-682(I), at 46 (1986), as reprinted in 1986 U.S.C.C.A.N. 5649, 5650; see id. ("Employment is the magnet that attracts aliens here illegally .... Employers will be deterred by the penalties in this legislation from hiring unauthorized aliens and this, in turn, will deter aliens from entering illegally or violating their status in search of employment.").[13] Thus, IRCA makes it unlawful for employers knowingly to hire unauthorized aliens. See 8 U.S.C. § 1324a(a). To ensure against such hiring, IRCA mandates employer verification of the legal status of persons hired. See id. § 1324a(b). Employers who fail to check their workers' immigration status or who fail to keep eligibility records face civil fines. See id. § 1324a(e)(4)(A). Employers who engage in a pattern or practice of knowingly employing undocumented aliens are subject to criminal penalties. Id. § 1324a(f).
 
 
 35
 As initially enacted, IRCA, like the INA, did not make it unlawful for undocumented aliens to accept employment in the United States. Indeed, at the same time that IRCA established employer sanctions as the centerpiece of its effort at immigration reform, Congress afforded millions of undocumented workers already in the United States the opportunity to legalize their status. See 8 U.S.C. § 1255a. Not until IRCA was itself amended in 1990 did Congress provide for penalties and sanctions to be imposed directly on undocumented workers who sought employment in the United States. See Immigration Act of 1990 § 544(a), Pub.L. No. 101-649, 104 Stat. 4978, 5059-60 (codified at 8 U.S.C. § 1324c). Even then, however, Congress made IRCA's new sanctions applicable only to aliens who knowingly or recklessly used false documents to obtain employment. See 8 U.S.C. § 1324c (a), (f). It did not otherwise prohibit undocumented aliens from seeking or maintaining employment.
 
 
 36
 (2) IRCA's Express Preemption Clause
 
 
 37
 From its initial enactment, IRCA has contained an express preemption clause, stating that "[t]he provisions of this section preempt any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens." 8 U.S.C. § 1324a(h)(2). The statute is silent, however, as to its preemptive effect on any other state or local laws.
 
 
 38
 2. Reconciling IRCA and Federal Labor Law in Hoffman Plastic
 
 
 39
 Significantly, it was not the preemptive effect of IRCA on state law that first required judicial attention. Rather, it was the potential for conflict between IRCA and other federal laws, specifically, federal labor law. The Supreme Court addressed this issue in Hoffman Plastic Compounds, Inc. v. NLRB, reversing a National Labor Relations Board ("NLRB") award of backpay to an undocumented worker on the ground that such recovery was "foreclosed by federal immigration policy" as expressed in IRCA. 535 U.S. at 140, 122 S.Ct. 1275. Because appellants insist that Hoffman Plastic precludes Madeira, as a matter of law, from recovering lost United States earnings as compensatory damages for personal injury under New York Labor Law § 240(1), we discuss that case, and its background, in some detail.
 
 
 40
 a. The Circuit Conflict Leading to Hoffman Plastic
 
 
 41
 Prior to Hoffman Plastic, a number of federal courts read the following language in the House Committee Report on IRCA to suggest that the statute's employer sanctions were not intended to preempt federal or state labor law protections:
 
 
 42
 It is not the intention of the Committee that the employer sanctions provisions of the bill be used to undermine or diminish in any way labor protections in existing law, or to limit the powers of federal or state labor relations boards, labor standards agencies, or labor arbitrators to remedy unfair practices committed against undocumented employees for exercising their rights before such agencies or for engaging in activities protected by existing law.
 
 
 43
 H.R. Rep. 99-682(I), at 58, as reprinted in 1986 U.S.C.C.A.N. at 5662. Nevertheless, attempts to reconcile this construction with federal immigration policy failed to reach consistent conclusions.
 
 
 44
 For example, in Montero v. INS, this court interpreted the above-quoted committee statement narrowly to mean that an undocumented worker is fully eligible for federal labor law remedies if "the alien is permitted by the INS to remain in the United States." 124 F.3d 381, 385 (2d Cir.1997) (rejecting argument that IRCA precluded deportation of undocumented alien based on evidence obtained in course of labor dispute, and holding that "[w]hether or not an undocumented alien has been the victim of unfair labor practices, such an alien has no entitlement to be in the United States").
 
 
 45
 Later that same year, this court concluded that such INS permission was not a condition precedent to the NLRB ordering an employer who had unlawfully terminated an undocumented worker to pay backpay, at least for a discrete period of time. See NLRB v. A.P.R.A. Fuel Oil Buyers Group, Inc., 134 F.3d 50, 57 (2d Cir.1997) (upholding backpay award to undocumented aliens "from the date of their unlawful discharge until either their qualification for future employment or the expiration of the reasonable time allowed for them to comply with IRCA").[14] The court explained that a "failure to enforce any backpay remedies" in the case "would encourage employers to compare the expense of IRCA's fines to the expenses of backpay and the advantage gained in resisting unions, and potentially to decide that the risks of IRCA's penalties are worth incurring." Id. It concluded that an NLRB backpay award to an undocumented worker did not violate the principles underlying IRCA because the award was simply compensation for economic injury caused by the employer's unlawful conduct; it did not reestablish an illegal working relationship between the employer and any undocumented alien. See id. at 58 ("[N]othing in the [NLRB's] order requires the company or the employers to violate IRCA."); see also id. at 57 (quoting NLRB reinstatement order conditioned on alien workers presenting employer with an "INS Form I-9 and the appropriate supporting documents" necessary to allow employer "to meet its obligations under IRCA").
 
 
 46
 In dissent, Judge Jacobs questioned the NLRB's authority to order an employer to award backpay for any period during which undocumented workers were, in fact, ineligible for employment under IRCA. He suggested that plaintiffs were entitled to backpay only from the date on which they established their eligibility to work under federal immigration law. See id. at 59-60 (Jacobs, J., dissenting in part and concurring in part); see also id. at 62 n. 4 (observing that, because "NLRB proceedings can span a whole decade, [a backpay award] is no small inducement to prolong illegal presence in the country.").
 
 
 47
 Nevertheless, the majority ruling in A.P.R.A. Fuel Oil found support in an earlier ruling by the Ninth Circuit in Local 512, Warehouse and Office Workers' Union v. NLRB, 795 F.2d 705 (9th Cir.1986). In that case, the Ninth Circuit held that undocumented workers terminated in violation of the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 141-97, could be awarded backpay because (1) the NLRB "routinely awards backpay to restore discriminatees to the economic position they would have enjoyed absent the unfair labor practice," (2) backpay awards deter future "similar unlawful practices," and (3) eliminating backpay awards to undocumented aliens would encourage employers to continue violating the NLRA, subverting its "broad remedial goals." Id. at 718; see also NLRB v. Kolkka, 170 F.3d 937 (9th Cir.1999) (sustaining NLRB cease-and-desist order against employer of undocumented workers). By contrast, in Del Rey Tortilleria, Inc. v. NLRB, 976 F.2d 1115, 1121 (7th Cir.1992), the Seventh Circuit ruled that, under Sure-Tan, undocumented workers could not be awarded backpay for any period during which they were not lawfully entitled to be present and employed in the United States.
 
 
 48
 The Supreme Court resolved this circuit split in Hoffman Plastic.
 
 
 49
 b. Hoffman Plastic Compounds, Inc. v. NLRB
 
 
 50
 In Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. 137, 122 S.Ct. 1275, 152 L.Ed.2d 271, the Supreme Court considered the NLRB's authority to award backpay to an undocumented worker terminated in violation of the NLRA for supporting efforts to unionize his place of employment. The worker, Jose Castro, was an undocumented alien from Mexico, who, in May 1988, was employed as a blending machine operator at Hoffman Plastic Compounds. Castro obtained his job by fraud, presenting his employer with what he knew were false United States identification documents. See id. at 140-41, 122 S.Ct. 1275. In December 1988, Castro began supporting a union-organizing campaign at Hoffman. In January 1989, Hoffman fired Castro and three other employees who engaged in similar union activity. Id. at 140, 122 S.Ct. 1275. Three years later, in January 1992, the NLRB found that Hoffman's actions violated Section 8(a)(3) of the NLRA, 29 U.S.C. § 158(a)(3). See Hoffman Plastic Compounds, Inc. and Arauz, 306 N.L.R.B. 100, 100 (N.L.R.B. 1992) ("[Hoffman], in order to rid itself of known union supporters, discriminatorily selected union adherents for layoffs."). The NLRB ordered Hoffman (1) to cease and desist from any such further violations, (2) to post a detailed notice to its employees explaining the NLRB's remedial order, and (3) to offer reinstatement and backpay to the four terminated employees, including Castro. See Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. at 140-41, 122 S.Ct. 1275.
 
 
 51
 A compliance hearing ensued to determine the amount of backpay to be awarded the wrongfully fired workers. An NLRB Administrative Law Judge ("ALJ") ruled that Castro was not entitled to any backpay award because he had used false documentation to obtain employment and had failed to present proof that he was currently lawfully in the United States. In such circumstances, and in light of the Supreme Court's ruling in Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 104 S.Ct. 2803, 81 L.Ed.2d 732, the ALJ concluded that a backpay or reinstatement award to Castro would conflict with IRCA. See Hoffman Plastic Compounds, Inc. and Arauz, 1993 WL 1609517 (N.L.R.B. Nov. 12, 1993), 1993 NLRB LEXIS 1157, at *8-12.
 
 
 52
 The NLRB reversed the ALJ's decision with respect to backpay, awarding Castro $66,951 in lost earnings from the date of his termination to the date when Hoffman first learned of Castro's status as an undocumented alien.[15] Hoffman Plastic Compounds, Inc. and Arauz, 326 N.L.R.B. 1060, 1062 (N.L.R.B.1998). In so ruling, the NLRB emphasized that "the most effective way to accommodate and further the immigration policies embodied in [IRCA] is to provide the protections and remedies of the [NLRA] to undocumented workers in the same manner as to other employees, to the extent that such enforcement does not require or encourage unlawful conduct by either employers or individuals." Id. at 1060. The D.C. Circuit twice denied Hoffman's petition for review of the NLRB order, see Hoffman Plastic Compounds, Inc. v. NLRB, 208 F.3d 229 (D.C.Cir.2000); 237 F.3d 639 (D.C.Cir. 2001) (en banc), prompting the Supreme Court's grant of a writ of certiorari, Hoffman Plastic Compounds, Inc. v. NLRB, 533 U.S. 976, 122 S.Ct. 23, 150 L.Ed.2d 804 (2001).
 
 
 53
 The Supreme Court ultimately reversed both the D.C. Circuit's and the NLRB's holdings, ruling that the NLRB's broad discretion to fashion remedies for violations of the NLRA, see Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. at 142-43, 122 S.Ct. 1275 (collecting cases), did not reach so far as to permit that agency "to award backpay to an illegal alien for years of work not performed, for wages that could not lawfully have been earned, and for a job obtained in the first instance by a criminal fraud," id. at 149, 122 S.Ct. 1275. Noting the circuit split over whether such a result was compelled by Sure-Tan, see supra pp. 233-34, the Supreme Court declined to rule on that precise question, observing that the subsequent enactment of IRCA made it appropriate to consider NLRB backpay awards "through a wider lens, focused as it must be on a legal landscape now significantly changed." Id. at 147, 122 S.Ct. 1275.
 
 
 54
 Describing the legal change effected by IRCA, the Court observed that it was now "impossible for an undocumented alien to obtain employment in the United States without some party directly contravening" federal immigration policy: "Either the undocumented alien tenders fraudulent identification, which subverts the cornerstone of IRCA's enforcement mechanism, or the employer knowingly hires the undocumented alien in direct contradiction of its IRCA obligations." Id. at 148, 122 S.Ct. 1275. Confronting the former circumstance in Hoffman Plastic, the Court concluded that any attempt by the NLRB to remedy the employer's unfair labor practice by awarding backpay to the undocumented alien would necessarily "run[ ] counter to policies underlying IRCA," which "policies the [NLRB] has no authority to enforce or administer." Id. at 149, 122 S.Ct. 1275. Indeed, the Court cited that alien's criminal procurement of employment with false documents as the fact that "sinks" NLRB arguments in defense of the backpay remedy, observing that, "[f]ar from `accommodating' IRCA, the [NLRB's] position, recognizing employer misconduct [under the NLRA] but discounting the misconduct of illegal alien employees [under IRCA], subverts it." Id. at 149-50, 122 S.Ct. 1275. Noting that it "never deferred" to the NLRB's "remedial preferences where such preferences potentially trench upon federal statutes and policies unrelated to the NLRA," id. at 144, 122 S.Ct. 1275; see id. at 143-44, 122 S.Ct. 1275 (collecting cases involving federal anti-mutiny statute, Bankruptcy Code, federal antitrust policy, and the Interstate Commerce Act), the Court ruled that NLRB backpay awards to illegal aliens "lie[ ] beyond the bounds" of that agency's discretion. Id. at 149, 122 S.Ct. 1275.[16]
 
 
 55
 The Court observed that its ruling did not deprive the NLRB of all power to sanction Hoffman for relying on NLRA-protected activity as the reason for terminating Castro. Federal immigration policy did not preclude the NLRB from ordering Hoffman, under penalty of contempt, to cease and desist from unfairly hindering that activity and to post a notice detailing its prior transgressions and informing employees of their rights. The Court concluded that these remedies were "sufficient to effectuate national labor policy regardless of whether the `spur and catalyst' of backpay accompanies them." Id. at 152, 122 S.Ct. 1275 (quoting Sure-Tan, Inc. v. NLRB, 467 U.S. at 904, 104 S.Ct. 2303).
 
 
 56
 3. Hoffman Plastic Does Not Conclusively Resolve the Question of IRCA's Preemption of State Laws
 
 
 57
 Appellants submit that Hoffman Plastic construes IRCA to preclude any award of lost United States earnings to an injured undocumented worker, regardless of the statutory authority invoked. Thus, they insist that IRCA bars New York State from allowing an undocumented worker injured in a construction accident to recover lost earnings at United States pay rates. Because Hoffman Plastic is distinguishable from this case in important factual and legal respects, we are not convinced by appellants' argument.
 
 a. Factual Distinctions
 
 58
 Focusing first on factual differences, we note that the injury being remedied in Hoffman Plastic was termination while the wrong being compensated in this case is disabling personal injury. The distinction is significant. The termination at issue in Hoffman Plastic, while unlawful under the NLRA (because motivated by the worker's protected union activities), was, in fact, effectively required by IRCA.[17] Given the two statutes' competing views of the termination at issue, there was particular reason to think that an NLRB backpay award to the worker for a period of time after termination directly conflicted with IRCA. This case presents no similar conflict because neither IRCA nor any other law authorized, much less required, any appellant to inflict disabling physical injury on Madeira.[18]
 
 
 59
 Further, in Hoffman Plastic, the employment relationship originated in the worker's own criminal violation of IRCA, prompting the Supreme Court to observe that it would "subvert[]" IRCA to penalize the employer's unfair labor practice but to discount the worker's immigration violation. Id. at 149-50, 122 S.Ct. 1275 (citing employee's criminal conduct in procuring employment as factor that "sinks" Board's argument that backpay award reasonably accommodates IRCA). No comparable worker misconduct is evident in this case. Madeira did not himself violate IRCA in procuring the employment that led to his injury. Rather, both the illegal employment relationship and the personal injury were the product of wrongdoing by others. Specifically, it was Madeira's employer C & L that hired him in knowing violation of IRCA. And it was C & L, Affordable, and Mountain that failed to provide safe work conditions in violation of New York law. Thus, because the application of New York law for calculating compensatory damages against the various appellants liable for personal injury in this case does not require any "discounting" of IRCA criminality by Madeira himself, the facts simply do not present the same concern for subversion of federal immigration law that was identified in Hoffman Plastic. In this case, the challenged remedy would be assessed against parties at least one of whom violated IRCA, and not awarded to the IRCA violator himself, as in Hoffman Plastic.
 
 b. Legal Distinction
 
 60
 There is also an important legal distinction between this case and Hoffman Plastic. In Hoffman Plastic, the Supreme Court sought to reconcile two federal statutes to ensure that one did not trench on the other, a task routinely performed by federal courts.[19] In this case, however, appellants urge us to hold that immigration law stands as an absolute bar to well-established state law relating to compensable damages for personal injury. We necessarily review such an argument carefully. As Justice Black famously observed, "Our Federalism" prescribes that the national government, "anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." Younger v. Harris, 401 U.S. 37, 44, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) (discussing federalism in context of abstention principle). Federalism concerns were not at issue and, therefore, were not addressed in Hoffman Plastic. To resolve them here, we look to well established principles of federal preemption.
 
 
 61
 4. There Is No Basis for Concluding that Congress Clearly Intended IRCA To Preempt Established State Law Principles for Compensating Lost Earnings in Personal Injury Cases Involving Undocumented Workers
 
 
 62
 a. The Legal Foundation for Federal Preemption of State Law
 
 
 63
 Constitutional authority for the federal preemption of state law is grounded in the Supremacy Clause, which states that "the Laws of the United States . . . shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Despite this sweeping language, courts do not readily assume preemption. To the contrary, "in the absence of compelling congressional direction," courts will not infer that "Congress ha[s] deprived the States of the power to act." New York Tel. Co. v. New York State Dep't of Labor, 440 U.S. 519, 540, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979) (internal quotation marks omitted). Indeed, when, as in this case, the state law at issue involves the historic police power over public safety, courts "`start with the assumption'" that these powers are "`not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)) (emphasis added); accord Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). Thus, as the Supreme Court has instructed, preemption "fundamentally is a question of congressional intent." English v. Gen. Elec. Co., 496 U.S. 72, 78-79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990); see Retail Clerks Int'l Assoc. v. Schermerhorn, 375 U.S. 96, 103, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963) (holding that "[t]he purpose of Congress is the ultimate touchstone" of preemption analysis).
 
 
 64
 Congress can convey its clear and manifest intent to preempt the exercise of state police power in three ways. First, Congress may explicitly state that it intends to preempt a state law. See English v. Gen. Elec. Co., 496 U.S. at 79, 110 S.Ct. 2270 (observing that "when Congress has made its [preemptive] intent known through explicit statutory language, the courts' task is an easy one"). Second, even absent any such explicit statement, Congress's preemptive intent may be implied "where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress `left no room' for supplementary state regulation," in short, where Congress has manifested an intent for federal law to occupy the field. Hillsborough County, Fla. v. Automated Med. Labs., Inc., 471 U.S. 707, 713, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. at 230, 67 S.Ct. 1146). Finally, Congress's preemptive intent may be implied from the fact that state law so conflicts with federal law that either "compliance with both federal and state regulations is a physical impossibility," Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), or state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," Hines v. Davidowitz, 312 U.S. at 67, 61 S.Ct. 399; see also Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 248, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984). The conflict standard for preemption is strict. As Chief Justice Rehnquist, the author of the Court's opinion in Hoffman Plastic, cautioned, federal preemption cannot be premised on "unwarranted speculations" as to Congress's intent. Jones v. Rath Packing Co., 430 U.S. at 544, 97 S.Ct. 1305 (Rehnquist, J., concurring in part and dissenting in part). A "clear demonstration of conflict . . . must exist before the mere existence of a federal law may be said to pre-empt state law operating in the same field." Id.[20]
 
 
 65
 Appellants fail convincingly to establish that Congress, either explicitly or implicitly, demonstrated a clear and manifest intent totally to preempt New York law allowing juries to award some measure of lost United States earnings to undocumented workers who sustain personal injuries in violation of Labor Law § 240(1).[21]
 
 b. Express Preemption
 
 66
 No provision in IRCA expressly preempts state law providing for injured undocumented workers to recover compensatory damages, including lost earnings. As noted supra pp. 231-32, IRCA's express preemption clause applies only to "any State or local law imposing civil or criminal sanctions" on persons who employ or assist in the employment of illegal aliens. 8 U.S.C. § 1324a(h)(2) (emphasis added). Compensatory damages for personal injury do not reasonably equate to sanctions. As the New York Court of Appeals observed in Balbuena v. IDR Realty LLC, "[a] sanction is generally considered a `penalty or coercive measure,' such as a punishment for a criminal act or a civil fine for a statutory or regulatory violation." 6 N.Y.3d at 357, 812 N.Y.S.2d at 425-26, 845 N.E.2d 1246 (quoting Black's Law Dictionary 1368 (8th ed.2004) (citation omitted)). By contrast, "the primary purpose of civil recovery in a personal injury action premised on state Labor Law provisions is not to punish the tortfeasor but to compensate the worker for injuries proximately caused by negligence or the violation of statutory safety standards." Id., 812 N.Y.S.2d at 426, 845 N.E.2d 1246; see also Mendoza v. Zirkle Fruit Co., 2000 WL 33225470 (E.D.Wash. Sept.27, 2000), 2000 U.S. Dist. LEXIS 21126, at *31-32 (noting distinction between sanctions and compensatory damages in rejecting IRCA preemption challenge to civil conspiracy action), rev'd on other grounds, 301 F.3d 1163 (9th Cir.2002); Dowling v. Slotnik, 712 A.2d 396, 403, 244 Conn. 781, 792 (1998) (observing that workers' compensation benefits could not be construed as sanctions in rejecting IRCA preemption challenge to their award). Thus, although the national power over immigration is undoubtedly supreme, see Hines v. Davidowitz, 312 U.S. at 62, 61 S.Ct. 399, we conclude that Congress has not explicitly exercised it to preempt state laws allowing undocumented aliens who sustain workplace injuries to recover compensatory damages for lost earnings, however calculated.
 
 
 67
 Congress's failure expressly to preempt a particular state law does not preclude a court from implying that intent. See Sprietsma v. Mercury Marine, 537 U.S. 51, 65, 123 S.Ct. 518, 154 L.Ed.2d 466 (2002) ("Congress' inclusion of an express pre-emption clause does not bar the ordinary working of conflict pre-emption principles . . . ." (internal quotation marks omitted) (emphasis removed)); Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 387-88, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). Thus, we consider the two circumstances that can give rise to implicit preemption.
 
 c. Implicit "Field" Preemption
 
 68
 Congress's intent to preempt state law may be implied where it has designed a pervasive scheme of regulation that leaves no room for the state to supplement, or where it legislates in "`a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state law on the same subject.'" English v. Gen. Elec. Co., 496 U.S. at 79, 110 S.Ct. 2270 (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. at 230, 67 S.Ct. 1146). As we have already noted, immigration is plainly a field in which the federal interest is dominant. See Hines v. Davidowitz, 312 U.S. at 62, 61 S.Ct. 399. State tort and labor laws, however, occupy an entirely different field. Appellants point us to nothing in the record supporting an inference that Congress, by enacting IRCA, demonstrated a clear and manifest intent to supersede — at least where illegal aliens are concerned — traditional state tort or labor laws determining the compensatory damages recoverable for personal injuries. See English v. Gen. Elec. Co., 496 U.S. at 79, 110 S.Ct. 2270 ("`Where . . . the field which Congress is said to have pre-empted' includes areas that have `been traditionally occupied by the States,' congressional intent to supersede state laws must be `clear and manifest.'" (quoting Jones v. Rath Packing Co., 430 U.S. at 525, 97 S.Ct. 1305) (omission in original)); see also Silkwood v. Kerr-McGee Corp., 464 U.S. at 255, 104 S.Ct. 615 (imposing burden of establishing Congress's preemptive intent on party challenging application of traditional state tort law).
 
 
 69
 To the extent Congress expressed any intent on the subject, the House Committee Report issued in conjunction with IRCA's enactment suggests that the legislation was not intended "to undermine or diminish in any way labor protections in existing law." H.R. Rep. 99-682(I), at 58, as reprinted in 1986 U.S.C.C.A.N. at 5662; see supra p. 232.[22] We are mindful that, in Hoffman Plastic, the Supreme Court concluded that this language merited little weight as evidence of Congress's affirmative intent to allow the NLRB to fashion unfair labor practice remedies at odds with federal immigration policy. See Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. at 149 n. 4, 122 S.Ct. 1275. But as we have already observed, in this case we do not simply reconcile two federal statutes; we consider federal preemption of established state law. Even if, in the preemption context, we heed Hoffman Plastic's admonition to afford the House Report little weight in identifying Congress's affirmative endorsement of other statutory remedies, the quoted language usefully highlights appellants' inability to carry their burden. They can point to nothing in the record indicating Congress's clear and manifest intent to preempt the field of compensatory damages for workplace injuries sustained by undocumented aliens. See Silkwood v. Kerr-McGee Corp., 464 U.S. at 255, 104 S.Ct. 615. Accordingly, we conclude that no field preemption bars the challenged award of lost earnings in this case.
 
 
 70
 d. Implicit "Conflict" Preemption
 
 
 71
 The most difficult question presented on this appeal is whether a compensatory award of lost earnings to an injured undocumented worker so conflicts with IRCA policy prohibiting the hiring of such an alien as to warrant an inference of federal preemption. At the outset, we reiterate that implicit conflict preemption is warranted only if appellants can clearly demonstrate that (a) compliance with both New York labor law and IRCA is physically impossible, or (b) New York Labor Law stands as an obstacle to the accomplishment and execution of the full congressional purposes and objectives stated in IRCA. See, e.g., Silkwood v. Kerr-McGee Corp., 464 U.S. at 248, 104 S.Ct. 615. What constitutes a sufficient obstacle "is a matter of judgment," to be informed by reference to the overall federal statutory scheme. Crosby v. Nat'l Foreign Trade Council, 530 U.S. at 373, 120 S.Ct. 2288; see also Geier v. Am. Honda Motor Co., 529 U.S. 861, 873, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000) (noting that preemptive obstacles go by various names: "`conflicting; contrary to; . . . repugnance; difference; irreconcilability; inconsistency; violation; curtailment; . . . interference,' or the like" (quoting Hines v. Davidowitz, 312 U.S. at 67, 61 S.Ct. 399) (omissions in original)). The mere fact of "tension" between federal and state law is generally not enough to establish an obstacle supporting preemption, particularly when the state law involves the exercise of traditional police power. See Silkwood v. Kerr-McGee Corp., 464 U.S. at 256, 104 S.Ct. 615 (holding that state award of punitive damages to person injured in nuclear incident did not conflict with federal remedial scheme regulating safety aspects of nuclear energy). Rather, "[t]he principle is thoroughly established that the exercise by the state of its police power, which would be valid if not superseded by federal action, is superseded only where the repugnance or conflict is so `direct and positive' that the two acts cannot `be reconciled or consistently stand together.'" Jones v. Rath Packing Co., 430 U.S. at 544, 97 S.Ct. 1305 (Rehnquist, J., dissenting in part and concurring in part) (quoting Kelly v. Washington, 302 U.S. 1, 10, 58 S.Ct. 87, 82 L.Ed. 3 (1937)) (emphasis added).
 
 
 72
 (1) Compliance With Both New York Labor Law § 240(1) and IRCA Is Not Physically Impossible
 
 
 73
 There is no irreconcilable conflict between IRCA and New York State Labor Law § 240(1) such that compliance with both the former's prohibition on the employment of undocumented workers and the latter's safe construction site obligation is physically impossible. As the New York Appellate Division, Second Department, has aptly observed, "as between an employer and the federal government, the act of hiring an undocumented worker knowingly or without verifying his or her employment eligibility is unlawful," but "as between the worker and an alleged tortfeasor, there are duties under the common law and the New York statutes governing workplace safety." Majlinger v. Cassino Contracting Corp., 25 A.D.3d at 24-25, 802 N.Y.S.2d at 64. Those duties "are unrelated to, and do not depend on, the worker's compliance with federal immigration laws." Id. at 25, 802 N.Y.S.2d 56.
 
 
 74
 (2) Compensatory Awards of Lost United States Wages Under New York Labor Law § 240(1) Do Not Stand as a Direct and Positive Obstacle to IRCA's Objectives
 
 
 75
 Preliminarily, we do not understand appellants to suggest that the general safety obligations imposed by New York Labor Law § 240(1) pose any obstacle to the attainment of IRCA's policy objectives. In fact, such an argument would be unconvincing in light of Hoffman Plastic. There, the Supreme Court acknowledged that an employer was obliged to desist, under penalty of contempt, from engaging in generally proscribed NLRA unfair labor practices against all employees, including undocumented workers. See Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. at 152, 122 S.Ct. 1275; see also Singh v. Jutla, 214 F.Supp.2d 1056, 1061 (N.D.Cal.2002) (noting that Hoffman Plastic did not foreclose all NLRA remedies to undocumented workers). In short, federal immigration law did not excuse the Hoffman Plastic employer from its general NLRA duties to engage in fair workplace practices toward all workers; it only precluded the NLRB from employing a particular remedy — backpay — when the victim of the unfair labor practice was an undocumented alien who had secured his employment through fraud and whose termination was, in fact, effectively required by IRCA. See Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. at 149-50, 122 S.Ct. 1275. So in this case, nothing in IRCA (or federal immigration policy generally) demands that employers, site owners, or general contractors be absolved from New York-imposed duties of workplace care whenever undocumented aliens provide labor on construction sites. Instead, as in Hoffman Plastic, the policy conflict issue in this case reduces to a concern about remedies, specifically, New York State's ability to award workers, including undocumented aliens, some measure of lost United States earnings in compensation for disabling injuries caused by workplace negligence. In addressing this issue, it is helpful to consider where the challenged compensatory award falls along a spectrum of remedies potentially available to undocumented workers.
 
 (a) Reinstatement
 
 76
 On the far end of remedies in plain conflict with federal immigration policy are orders directing employers who have violated some other law to reinstate undocumented workers. In such circumstances, the conflict with federal immigration law is both direct and positive because compliance with the remedial order requires the employer to violate IRCA. Cf. Sure-Tan, Inc. v. NLRB, 467 U.S. at 902-03, 104 S.Ct. 2803 (noting that NLRB order conditioning reinstatement on employee's legal reentry into United States thereby avoided conflict with INA); Montero v. INS, 124 F.3d at 384-85 (collecting cases and noting that prospective remedies such as reinstatement consistently have "been dependent upon whether the alien is permitted by the INS to remain in the United States"); Del Rey Tortilleria, Inc. v. NLRB, 976 F.2d at 1120 ("[A]n illegal alien `is plainly not entitled to prospective relief — reinstatement and continued employment — that probably would be granted to other victims of similar unfair labor practices.'" (quoting INS v. Lopez-Mendoza, 468 U.S. 1032, 1047 n. 4, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984))).
 
 (b) FLSA Orders
 
 77
 At the other end of the spectrum are orders that do not require, or even presume, a continuing violation of IRCA, for example, an order requiring an employer to pay his undocumented workers the minimum wages prescribed by the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-19, for labor actually and already performed. In such circumstances, the immigration law violation has already occurred. The order does not itself condone that violation or continue it. It merely ensures that the employer does not take advantage of the violation by availing himself of the benefit of undocumented workers' past labor without paying for it in accordance with minimum FLSA standards. Thus, a number of district courts have concluded, even after Hoffman Plastic, that IRCA does not preclude such FLSA awards.[23]
 
 
 78
 (c) Remedies That Presume Continued IRCA Violations
 
 
 79
 Falling between these examples are various remedies that, while not mandating actual IRCA violations, nevertheless appear to presume that, but for the wrong being remedied, the unlawful employment relationship would have continued. Whether such remedies stand as direct and positive obstacles to IRCA's policy objectives supporting an inference of Congress's manifest intent to preempt admits no uniform answer. The particular circumstances in which the state and federal laws interact must be carefully considered in deciding whether conflict preemption can appropriately be implied. Before turning to the instant case, it is useful to consider the circumstances in two paradigmatic situations in this intermediate range, the first in which a backpay or lost earnings award to an undocumented worker is clearly disallowed, and the second in which it is allowed, at least by a number of courts.
 
 
 80
 (i) The Disallowance of Backpay in Hoffman Plastic
 
 
 81
 The NLRB backpay award disallowed in Hoffman Plastic presumed that, but for the employer's engagement in an unfair labor practice, the undocumented worker would have continued in its employ, at least until the employer discovered his undocumented status. Although federal preemption was not at issue in Hoffman Plastic, two facts in that case are useful in identifying the sort of conflicts between IRCA and lost earnings awards that might support an inference of preemption. First, as previously noted, supra pp. 236-37, the injury being compensated by the challenged backpay award — termination — violated the NLRA only because of the employer's motivation; otherwise, it was effectively required by IRCA. To compensate an employee under one statute for conduct effectively required by another plainly raises conflict concerns not present when, as in this case, the conduct at issue — personal injury — is not authorized by any statute. Second, the terminated employment relationship at issue in Hoffman Plastic originated in a criminal IRCA violation by the employee. Awarding such an employee backpay for his employer's NLRA violation while ignoring the employee's own criminal IRCA conduct subverts IRCA in a way not present when, as here, it is the employer who violates both federal and state law. New York's Court of Appeals has by no means indicated that it would approve a § 240(1) lost earnings award to an undocumented alien who procured employment by criminally violating IRCA. Indeed, in Balbuena v. IDR Realty LLC, 6 N.Y.3d at 360, 812 N.Y.S.2d at 428, 845 N.E.2d 1246, that court specifically noted that the plaintiffs in that case — "unlike the alien in Hoffman [Plastic] — did not commit a criminal act under IRCA."[24]
 
 
 82
 Thus, two facts critical to Hoffman Plastic's identification of a conflict between two federal statutory schemes are not present to support appellants' preemption argument in this case.
 
 
 83
 (ii) The Allowance of Workers' Compensation Awards to Undocumented Aliens
 
 
 84
 Like the backpay at issue in Hoffman Plastic and the lost earnings in this case, a workers' compensation award implicitly presumes that, but for the workers' injury, the unlawful employment relationship would have continued.[25] Both before and after Hoffman Plastic, however, state courts have almost uniformly held that workers' compensation awards are not an obstacle to the accomplishment and execution of the policy and purposes of IRCA.[26] Rather, courts have generally concluded that uniform application of workers' compensation laws best serves the interests of both federal and state law.
 
 
 85
 As the Connecticut Supreme Court has observed with respect to federal immigration law, "excluding [undocumented] workers from the pool of eligible employees would relieve employers from the obligation of obtaining workers' compensation coverage for such employees and thereby contravene the purpose of the Immigration Reform Act by creating a financial incentive for unscrupulous employers to hire undocumented workers." Dowling v. Slotnik, 712 A.2d at 404, 244 Conn. at 796. Other state courts have echoed this point. See, e.g., Farmer Brothers Coffee v. Workers' Comp. Appeals Bd., 35 Cal.Rptr.3d 23, 28, 2005 Cal.App. LEXIS 1618, at *10 (noting that if employers were permitted to deny workers' compensation benefits to undocumented workers, "unscrupulous employers would be encouraged to hire aliens unauthorized to work in the United States, by taking the chance that the federal authorities would accept their claims of good faith reliance upon immigration and work authorization documents that appear to be genuine"); Reinforced Earth Co. v. Workers' Comp. Appeal Bd., 749 A.2d 1036, 1039 (Pa.Commw.Ct.2000), 2000 Pa. Commw. LEXIS 200, at *8 (noting that the denial of workers' compensation benefits to injured undocumented employees would provide employers with an incentive to violate federal immigration law by "actively seek[ing] out illegal aliens rather than citizens or legal residents because they will not be forced to insure against or absorb the costs of work-related injuries"). At the same time, state courts express understandable concern that the denial of workers' compensation benefits would seriously undermine the state's significant interest in promoting workplace safety and protecting the public fisc by leading employers of undocumented aliens to think that they can "engage in unsafe practices with no fear of retribution, secure in the knowledge that society would have to bear the cost of caring for these injured workers." Design Kitchen & Baths v. Lagos, 882 A.2d 817, 826, 388 Md. 718, 733. These twin concerns hardly suggest that a workers' compensation award stands as a direct and positive obstacle to federal immigration policy.
 
 
 86
 We are, of course, mindful that, in Hoffman Plastic, the NLRB proffered an analogous argument, i.e., that its backpay order served to reduce employer incentives both to hire illegal aliens in violation of IRCA and to engage in unfair labor practices proscribed by the NLRA. A majority of the Supreme Court reversed the order. That decision, however, must be viewed in context.
 
 
 87
 The Hoffman Plastic majority did not explicitly reject the general premise of the NLRB's denial incentive argument. Rather, it identified other factors in the case that tipped the conflict balance decidedly against the agency. As we have now repeatedly observed, the termination that the NLRB attempted to remedy with a backpay order in Hoffman Plastic was conduct effectively required by IRCA. Moreover, the terminated employment in Hoffman Plastic originated in a criminal IRCA violation by the employee, not the employer, a fact cited by the Supreme Court as "sink[ing]" the NLRB's efforts to characterize its backpay award as consistent with IRCA as well as the NLRA. Id. at 149-50, 122 S.Ct. 1275 (holding that recognizing employer's misconduct under the NLRA while discounting employee's IRCA violation subverts rather than accommodates federal immigration law).
 
 
 88
 Where, however, these Hoffman Plastic circumstances are not present — where the undocumented worker has committed no IRCA crime, where the employment relationship originates in the employer's knowing violation of IRCA duties, and where the wrong being compensated is personal injury not authorized by IRCA under any circumstances — any alleged conflict, particularly between federal and state law, may not be so apparent. Thus, with respect to workers' compensation, a viable policy argument might still be made that a benefits award to an injured undocumented alien better serves to encourage employer compliance with both federal immigration and state safety laws than would a benefits denial. In any event, in such circumstances, courts have certainly not identified a direct and positive conflict warranting federal preemption of workers' compensation awards.[27]
 
 
 89
 To the extent workers' compensation benefits sometimes represent more than the undocumented worker could have earned in his native country, employers might argue that such "windfalls" could encourage illegal immigration in violation of federal law. Whether such an argument is more than speculative is something we need not decide on this appeal. See id. at 155, 122 S.Ct. 1275 (Breyer, J., dissenting) (and cases cited therein) (dismissing as speculative suggestion that aliens' decision to enter United States is influenced by benefits of labor laws). While such overpayments may evidence a degree of tension between state law calculations of workers' compensation benefits and federal immigration policy, courts have not identified that circumstance as a definite and positive obstacle to the effective operation of that policy.
 
 
 90
 (iii) The § 240(1) Award of Lost United States Earnings in This Case
 
 
 91
 As we have already observed, New York Labor Law § 240(1) supplements the state's workers' compensation laws by extending absolute liability for construction injuries to site owners and supervising general contractors. Applying some of the conflict principles identified in our foregoing discussion of workers' compensation benefits and other remedies to this case, we identify five reasons why the § 240(1) award of lost United States earnings to Madeira does not stand as an obstacle to the full purposes and objectives of Congress as stated in IRCA.
 
 
 92
 First, unlike the termination in Hoffman Plastic, the personal injury at issue in this case is not conduct authorized by IRCA under any circumstances. See supra pp. 236, 243-44. Thus, New York law does not subvert IRCA by requiring a defendant to compensate an alien worker for action required by IRCA.
 
 
 93
 Second, unlike reinstatement, a lost earnings award to an injured worker does not require the worker or his employer actually to commit or continue to commit an IRCA violation. See supra p. 243. At most, the award hypothesizes the continued employment relationship simply as a means of calculating damages to the injured worker.
 
 
 94
 Third, insofar as an undocumented worker's employment necessarily originates in a past IRCA violation that would presumably have continued but for the injury, the Supreme Court has thus far recognized a backpay or lost earnings award to conflict with federal immigration law only when the IRCA violation prompting employment was committed by the employee, not, as in this case, by the employer. See Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. at 149-50, 122 S.Ct. 1275.[28] See supra pp. 237, 243-44.
 
 
 95
 Fourth, when, as in this case, both the illegal employment relationship and the personal injury are attributable to the wrongful conduct of persons other than the undocumented worker, a denial of lost earnings compensation, like a denial of workers' compensation, see supra pp. 245-46, is more apt to subvert both federal and state law than a grant of such compensation is apt to place the two in direct and positive conflict with one another. As the New Hampshire Court of Appeals observed in recently rejecting a Hoffman Plastic-based challenge to its state law allowing an undocumented worker to recover lost United States earnings for workplace injuries: "To refuse to allow recovery against a person responsible for an illegal alien's employment who knew or should have known of the illegal alien's status would provide an incentive for such persons to target illegal aliens for employment in the most dangerous jobs or to provide illegal aliens with substandard working conditions." Rosa v. Partners in Progress, Inc., 868 A.2d 994, 1000, 152 N.H. 6, 13 (2005). Allowing such recoveries would not trench on federal immigration policy because, although the compensatory awards would stem from illegal relationships, employers could avoid the result by complying with IRCA and refusing to hire illegal aliens in the first place. See id. at 1001, 152 N.H. at 14, 868 A.2d 994. No different conclusion is warranted because the defendants in this case are a general contractor and a site owner who bring Madeira's direct employer, C & L, before the court only in a third-party action. As already discussed, see supra pp. 228-29, New York's strong interest in such contractors and site owners guaranteeing the safety of construction sites is codified in Labor Law § 240(1). To allow § 240(1) defendants "to avoid paying damages" to an injured undocumented worker "on the ground that it was the [worker's direct] employer who violated IRCA would, in essence, partially relieve defendants of their nondelegable duty and thereby produce a result that is inconsistent with Labor Law statutes." Balbuena v. IDR Realty LLC, 6 N.Y.3d at 361 n. 8, 812 N.Y.S.2d at 428 n. 8, 845 N.E.2d 1246. More to the point for purposes of our conflict inquiry, there is simply no federal interest in absolving contractor and site owner defendants of their § 240(1) duty. Unlike the termination injury in Hoffman Plastic, IRCA neither effectively requires nor condones appellants' denial to undocumented workers of the duty of care mandated by § 240(1).
 
 
 96
 Fifth and finally, although New York allows juries to compensate injured undocumented workers for lost United States earnings, it instructs them to consider the workers' removability in calculating what, if any, compensation to award. Such an instruction may not totally eliminate the tension implicit in a compensatory award that presumes continued employment in violation of IRCA. See Balbuena v. IDR Realty LLC, 6 N.Y.3d at 367, 812 N.Y.S.2d at 432-33, 845 N.E.2d 1246 (R.S. Smith, J., dissenting) (concluding that jury instruction on worker removability is inadequate to avoid IRCA preemption of state award of lost United States earnings pursuant to § 240(1)). Nevertheless, the instruction in this case serves, together with the other four factors identified, to preclude us from identifying the lost earnings award to Madeira as a "direct and positive" obstacle to the attainment of IRCA's policy and purpose. Jones v. Rath Packing Co., 430 U.S. at 544, 97 S.Ct. 1305 (Rehnquist, J., dissenting in part and concurring in part) (quoting Kelly v. Washington, 302 U.S. at 10, 58 S.Ct. 87). Thus, we cannot infer that Congress's "clear and manifest" intent is to preempt established New York law awarding such compensation to undocumented workers injured in violation of its strict labor laws. Id. at 525, 97 S.Ct. 1305 (internal quotation marks omitted). Of course, if Congress thinks it necessary in furtherance of federal immigration policy to preclude state law compensatory damage awards such as the one in this case, it may certainly do so, but it must manifest that intent clearly.[29]
 
 
 97
 In sum, although federal immigration law prohibited Madeira's employment in this country, where, as in this case, both his initial hiring in violation of IRCA and his personal injury resulted from the wrongdoing of others, we identify no clear conflict between federal immigration law and New York law allowing a jury, upon being instructed to consider an alien's removability, to award some measure of compensatory damages based on lost United States earnings for a violation of Labor Law § 240(1). It is not physically impossible to comply with both IRCA and New York labor law, and appellants have failed convincingly to demonstrate that New York law, as applied in this case, stands as a definite and positive obstacle to the accomplishment and execution of the full purposes and objectives of Congress. Accordingly, we reject appellants' claim of conflict preemption as without merit and uphold the damages awarded at the first phase of trial.
 
 
 98
 C. The Remaining Claims on Appeal Are Without Merit
 
 
 99
 1. Liability for Madeira's Injuries Was Properly Apportioned Among C & L, Affordable, and Mountain
 
 
 100
 Following the second phase of the trial, the jury apportioned liability among Silva, Affordable, and Mountain, holding Silva's alter ego, C & L, 82% liable and Affordable and Mountain each 9% liable for Madeira's injuries. On appeal, Affordable and Mountain argue that the district court erred in permitting the jury to apportion liability, contending that, because they were held absolutely liable under New York Labor Law § 240(1) in the first phase of the trial, there was no basis for the jury to find them contributorily negligent in the second phase and, thus, to hold them proportionally liable. They are wrong.
 
 
 101
 In the first phase of trial, the jury did find Affordable and Mountain liable under New York Labor Law § 240(1) for Madeira's personal injuries. Moreover, because § 240(1) imposes absolute liability, see Blake v. Neighborhood Hous. Servs. of N.Y. City, Inc., 1 N.Y.3d 280, 289, 771 N.Y.S.2d 484, 489-90, 803 N.E.2d 757 (2003), no evidence regarding negligence on the parts of Affordable or Mountain was presented during the first phase.[30] In the second phase, however, the jury found that an enforceable contract required C & L to indemnify Affordable and Mountain, but only to the extent of its own negligence. Indeed, the indemnification agreement provides:
 
 
 102
 Indemnification: To the fullest extent permitted by law, Subcontractor [C & L] shall indemnify and hold harmless the General Contractor [Mountain] and Owner [Affordable] against any claims, damages, losses, and expenses, including legal fees, arising out of or resulting from performance of subcontracted work to the extent caused in whole or part by the Subcontractor or anyone directly or indirectly employed by the Subcontractor.
 
 
 103
 Construction Contract, June 15, 2001 (emphasis added). In order to determine how much indemnification — if any — C & L owed to Affordable and Mountain, therefore, the jury had to apportion liability for negligence among the three parties. Absent apportionment, Affordable and Mountain stood to recover indemnification even for losses caused by their own negligence, a result at odds with the indemnification agreement itself. As the district court explained:
 
 
 104
 There was no finding of negligence in the first phase of the trial because negligence was irrelevant to plaintiff's claim against Affordable and Mountain under § 240(1). Affordable and Mountain could have been — and were — held liable to plaintiff irrespective of any negligence on their part. Negligence was, however, relevant to Phase II of the trial. The jury was, therefore, asked if Affordable or Mountain were negligent, and, if so, to apportion fault at the conclusion of Phase II.
 
 
 105
 Madeira v. Affordable Hous. Found., Inc., 315 F.Supp.2d at 508. We agree with the district court's analysis of the record and conclude that it properly rejected Affordable's and Mountain's challenge to the apportionment of liability.
 
 
 106
 2. The District Court Did Not Err in Precluding Evidence that C & L Lacked Insurance for Affordable and Mountain
 
 
 107
 Affordable and Mountain contend that, "[i]n interpreting the first cause of action [in their third-party complaint] as limited to breach of the indemnity provision, the district court committed error and must be reversed." Cross-Appellants' Br. at 21. Although Affordable and Mountain fail to identify the context in which the district court interpreted its first cause of action — much less, the place in the record where that interpretation appears — or to explain what action the district court actually took that constituted reversible error, its argument appears under the heading "Precluding Proof of Lack of Insurance Is Erroneous as a Matter of Law." Id. at 19. Accordingly, we construe Affordable's and Mountain's appeal as a challenge to an evidentiary decision by the district court to preclude evidence regarding C & L's failure to secure insurance for Affordable and Mountain as "additional insureds" under C & L's policy with Preferred, its insurer. We review the district court's "evidentiary rulings under a deferential abuse of discretion standard and give district court judges wide latitude in determining whether evidence is admissible at trial." Meloff v. New York Life Ins. Co., 240 F.3d 138, 148 (2d Cir.2001) (internal quotation marks omitted).
 
 
 108
 Here, any evidence that C & L failed to name Affordable and Mountain as additional insureds in its policy with Preferred was properly excluded as cumulative and wasteful of the court's and the jury's time because the parties entered into a stipulation to that fact. See Trial Tr. 512-13[31]; see also International Minerals & Resources, S.A. v. Pappas, 96 F.3d 586, 596 (2d Cir.1996) ("A district judge has discretion to exclude evidence if it is cumulative of evidence already in the record."); United States v. Holmes, 44 F.3d 1150, 1157 (2d Cir.1995) ("Absent a clear abuse of discretion, a trial judge retains a wide latitude to exclude irrelevant, repetitive, or cumulative evidence."); see also Fed.R.Evid. 403. Counsel for Preferred stated: "the issue of the additional insured status is not being contested .... no evidence will be shown to the jury because it is uncontroverted that the policy in issue does not, in fact, contain any additional insured status for Mountain and Affordable." Trial Tr. 512-13. Counsel for Affordable confirmed: "what we are stipulating is ... that the insurance contract did not provide additional insurance." Id. at 513. We conclude, therefore, that the district court acted well within its discretion in precluding additional evidence of the stipulated fact that C & L's insurance policy with Preferred did not name Affordable and Mountain as additional insureds.
 
 
 109
 3. The District Court Properly Dismissed Preferred
 
 
 110
 Following phase two of the trial, the district court granted Preferred's motion to dismiss, ruling that Affordable and Mountain would "have to be [] insured[s] under this policy" or otherwise "in contractual privity with the insurance company in order to maintain a direct action against the insurance company." Trial Tr. 968. On appeal, Affordable and Mountain charge that the dismissal was erroneous, because, while not additional insureds actually named in the policy, they were, nevertheless, entitled to coverage by virtue of their "insured contract" with C & L. Cross-Appellants' Br. at 21-23. We are not persuaded.
 
 
 111
 "It is ancient law in New York that to succeed on a third party beneficiary theory, a non-party must be the intended beneficiary of the contract, not an incidental beneficiary to whom no duty is owed." County of Suffolk v. Long Island Lighting Co., 728 F.2d 52, 63 (2d Cir.1984) (citing Lawrence v. Fox, 20 N.Y. 268 (1859)); see also Port Chester Elec. Constr. Corp. v. Atlas, 40 N.Y.2d 652, 655, 389 N.Y.S.2d 327, 330, 357 N.E.2d 983 (1976). "A party asserting rights as a third-party beneficiary must establish `(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost.'" State of Cal. Pub. Employees. Ret. Sys. v. Shearman & Sterling, 95 N.Y.2d 427, 434-35, 718 N.Y.S.2d 256, 259, 741 N.E.2d 101 (2000) (quoting Burns Jackson Miller Summit & Spitzer v. Lindner, 59 N.Y.2d 314, 336, 464 N.Y.S.2d 712, 722, 451 N.E.2d 459 (1983)). Thus, under New York law, "where the insurance contract does not name, describe, or otherwise refer to the entity or individual seeking the benefit thereof as an insured, there is no obligation to defend or indemnify." State of New York v. Am. Mfrs. Mut. Ins. Co., 188 A.D.2d 152, 155, 593 N.Y.S.2d 885, 886 (3d Dep't 1993) (internal citations omitted). Here, C & L's insurance policy did not "name, describe, or otherwise refer" to Affordable or Mountain, and Affordable and Mountain present no other evidence from which any reasonable trier of fact could conclude that they were entitled to coverage under that policy. Additionally, because the district court correctly found that Affordable and Mountain were not insureds or third-party beneficiaries under the policy, and because they have not obtained a judgment against the alleged tortfeasor, C & L, they lack standing to pursue an action against Preferred. See Lang v. Hanover Ins. Co., 3 N.Y.3d 350, 354, 787 N.Y.S.2d 211, 214, 820 N.E.2d 855 (2004). Thus we conclude that the district court correctly ruled that, as a matter of law, Affordable and Mountain cannot maintain an action against Preferred.
 
 
 112
 4. An Enforceable Contract Obligated C & L To Indemnify Affordable and Mountain
 
 
 113
 Silva contends that no enforceable contract required him or C & L to indemnify Affordable and Mountain for losses resulting from Madeira's damages award because the purported agreement among the parties was neither sufficiently definite in its terms nor signed by any person with authority to represent C & L. In fact, Silva insists that the purported contract was the result of forgery and, thus, void ab initio. We disagree.
 
 
 114
 (a) The Terms of the Contract, When Viewed as a Whole, Were Sufficiently Definite
 
 
 115
 "Few principles are better settled in the law of contracts than the requirement of definiteness. If an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract." Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp., 74 N.Y.2d 475, 482, 548 N.Y.S.2d 920, 923, 548 N.E.2d 203 (1989); see also Express Indus. & Terminal Corp. v. New York State Dep't of Transp., 93 N.Y.2d 584, 589, 693 N.Y.S.2d 857, 860, 715 N.E.2d 1050 (1999) ("To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." (citation omitted)); see generally 22 N.Y. Jur. Contracts § 20 (2006) ("The very essence of a contract is definiteness as to material matters .... If an agreement is not reasonably certain in its material terms, there can be no legally enforceable terms.").
 
 
 116
 In denying Silva's Rule 50(b) motion, the district court concluded, based on a review of Paulo Miranda's testimony at trial, that "[t]here was ... evidence presented at trial from which a reasonable jury could determine that Miranda understood the terms of the agreement." Madeira v. Affordable Hous. Found., Inc., 315 F.Supp.2d at 510. Viewing the evidence "in the light most favorable" to Affordable and Mountain and giving them "the benefit of all reasonable inferences that the jury might have drawn in [their] favor from the evidence," Stratton v. Dep't for the Aging, 132 F.3d 869, 878 (2d Cir.1997) (internal quotation marks omitted), we agree with the district court that the contract between C & L, Affordable, and Mountain was sufficiently definite to permit the jury to find it enforceable.
 
 
 117
 Crucial to our conclusion is the recognition that the construction contract was in two parts: (1) an oral agreement covering most of the material terms regarding the construction project and (2) a written agreement covering insurance and indemnity issues, as required by New York law. Paulo Miranda testified that, prior to beginning work on the Monroe construction project, he negotiated the terms of an oral agreement with Jacob Sofer, President of Affordable and Mountain. Specifically, he testified that he and Sofer discussed the location of the Monroe project, the work that C & L would perform, and the "progress payments" that Affordable and Mountain would make. See Trial Tr. 595-98. Sofer's testimony largely corroborated Miranda's account. See id. at 671-73.
 
 
 118
 Silva nevertheless argues that the written portion of the contract was insufficiently definite to constitute an enforceable contract under New York law. The district court, however, exhaustively explored and ultimately rejected as a matter of law the claim that the entire construction contract must be in writing. See Trial Tr. 786 ("[I]f you view the construction contract as the amalgam of its oral and its written portions, knowing that the statute of frauds does not apply, it's sufficiently definite."); see also id. at 716-17. This conclusion finds support in New York law. See Podhaskie v. Seventh Chelsea Assocs., 3 A.D.3d 361, 362, 770 N.Y.S.2d 332, 334 (1st Dep't 2004). Moreover, because Silva does not argue on appeal that the Statute of Frauds applies to the contract here at issue, he has, in fact, waived any argument to that effect. See Norton v. Sam's Club, 145 F.3d 114, 117 (2d Cir.1998). Accordingly, we identify no error in the district's rejection of Silva's definiteness challenge to C & L's contract with Affordable and Mountain.
 
 
 119
 (b) Paulo Miranda, Who Had Authority to Represent C & L, Assented to the Terms of the Contract
 
 
 120
 On appeal, Silva does not dispute that Miranda assented to a deal with Sofer. Rather, Silva asserts that Miranda did not do so on behalf of C & L. As the district court indicated in a colloquy with the parties, however, the issue of assent "ultimately . . . depends on whether the jury believe[d] ... Mr. Paulo [Miranda] ... when he said he had authority to enter into [the construction contract]." See Trial Tr. 785-86. In denying Silva's motion, the district court also ruled that "there was sufficient evidence from which a jury could conclude that [Miranda] did in fact assent to [the construction contract's] terms on behalf of Silva — in fact, as Silva's partner." Madeira v. Affordable Hous. Found., Inc., 315 F.Supp.2d at 510; see also id. at 511 (noting that Miranda "assented (on behalf of himself and Silva) to the terms of the agreement").
 
 
 121
 Miranda testified, in no uncertain terms, that he was Silva's partner in C & L. Specifically, Miranda testified that he and Silva entered an oral partnership agreement during an earlier construction project and that this agreement continued for the Monroe project. See Trial Tr. 611-12. He also testified that, as partners, he and Silva split both the costs of doing business, such as insurance premiums, and the profits from their projects. See id. at 602, 606. Silva, not surprisingly, denied Miranda's account, testifying that, although he and Miranda had agreed to split profits and expenses on the earlier project, see id. at 801, the two had no agreement, oral or otherwise, to be partners on the Monroe project, see id. at 815-18.
 
 
 122
 In finding that Miranda assented to the construction contract as Silva's partner and as an authorized agent of C & L acting within the scope of his authority, we must presume that the jury found Miranda credible.[32] See Stratton v. Dep't for the Aging, 132 F.3d at 878. Because Miranda's testimony provided evidence in support of the jury's finding, that finding must stand. We conclude, therefore, that the district court properly rejected Silva's claim and declined to overturn the jury's finding that Miranda assented to the construction contract on behalf of C & L.
 
 III. Conclusion
 
 123
 To summarize, we hold that IRCA does not preempt, either expressly or implicitly, a compensatory damages award to an undocumented worker for personal injury under New York Labor Law § 240(1) that includes some measure of lost United States earnings. Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. 137, 122 S.Ct. 1275, 152 L.Ed.2d 271, does not dictate a different result particularly where, as in this case, neither IRCA nor any other law authorized the personal injury being compensated; the employment of the undocumented worker originated in a knowing violation of IRCA by the employer rather than the employee; and the jury was instructed to consider the undocumented plaintiff's removability in deciding what, if any, lost United States earnings to award. For this reason and because the parties' other appellate challenges to various rulings of the district court lack merit, we hold that the district court's May 7, 2004 judgment is hereby AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 Although the plaintiff is referred to in the parties' papers alternately as "Madeira" and "Miranda," for the sake of clarity, we refer to him throughout this opinion as Madeira, consistent with the official caption on appeal. We refer to Madeira's brother, Paulo, as "Miranda," consistent with his own testimonySee Trial Tr. 32.
 
 
 [2]
 The Scaffold Law states, in relevant part:
 All contractors and owners and their agents, except owners of one and two-family dwellings who contract for but do not direct or control the work, in the erection, demolition, repairing, altering, painting, cleaning or pointing of a building or structure shall furnish or erect, or cause to be furnished or erected for the performance of such labor, scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, placed and operated as to give proper protection to a person so employed.
 N.Y. Labor Law § 240(1) (McKinney 2002). Contractors and owners are absolutely liable for injuries caused by their violations of New York Labor Law § 240(1). See Blake v. Neighborhood Hous. Servs. of N.Y. City, Inc., 1 N.Y.3d 280, 289, 771 N.Y.S.2d 484, 489-90, 803 N.E.2d 757 (2003); Taeschner v. M & M Restorations, Ltd., 295 A.D.2d 598, 599, 745 N.Y.S.2d 41, 42 (2d Dep't 2002) ("Labor Law § 240(1) imposes absolute liability upon a contractor or owner who fails to provide safety devices to a worker at an elevated work site where the lack of such devices is a substantial factor in causing that worker's injuries") (citing Zimmer v. Chemung County Performing Arts, Inc., 65 N.Y.2d 513, 519, 493 N.Y.S.2d 102, 103-04, 482 N.E.2d 898 (1985)). Thus, even though Madeira was employed by C & L, he could pursue absolute liability claims against Affordable and Mountain under Labor Law § 240(1).
 
 
 [3]
 Based on his prior earnings in Brazil of $175 per month, Madeira's lost future earnings over twenty-six years there would have equaled only $54,600, assuming 12 months of work per year. Thus, the $230,000 future earnings award could not reasonably be viewed as reflecting lost earnings entirely in Brazil
 
 
 [4]
 With Madeira earning approximately $15 per hour in the United States, a conservative estimate that he would average forty (rather than fifty) work hours per week for forty-eight weeks per year would result in lost earnings in this country over twenty-six years of $748,800, so far in excess of the jury's award as to preclude the conclusion that the award reflected lost earnings entirely in the United States
 
 
 [5]
 While various mathematical combinations of time worked in the United States and time worked in Brazil can be imagined to yield an award of $230,000, one example would be for a jury to conclude that, but for his injury, Madeira would have remained and worked in the United States for approximately six and one-half years after judgment before returning to Brazil and working another nineteen and one-half years in that country. At $15 per hour for a forty-hour work week over the course of six and one-half years, Madeira could presumably have earned $187,200 in the United States; at $175 per month over nineteen and one-half years in Brazil, Madeira could have earned $40,950, for a total only slightly shy of the jury's $230,000 award
 
 
 [6]
 Silva's Rule 50(b) motion for a new trial was based on a claim of insufficient evidence that he assented to the terms of the indemnification contractSee Madeira v. Affordable Hous. Found., Inc., 315 F.Supp.2d. at 510. On this appeal, however, Silva appears to have abandoned his request for a new trial; instead, he requests judgment as a matter of law on the contested claims.
 
 
 [7]
 To the extent Silva initially moved pursuant to Rule 50(b) for a new trial, we would review the district court's denial of that relief even more deferentially "for abuse of discretion."Tesser v. Bd. of Educ., 370 F.3d 314, 320 (2d Cir.2004) ("A motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice" (internal quotation marks omitted)).
 
 
 [8]
 In so ruling, the New York Court of Appeals resolved a split that had developed between the state Appellate Division's First and Second DepartmentsCompare Sanango v. 200 E. 16th St. Hous. Corp., 15 A.D.3d 36, 788 N.Y.S.2d 314 (1st Dep't 2004) (holding that IRCA preempts injured undocumented workers' rights to sue under state labor law for lost United States earnings), and Balbuena v. IDR Realty LLC, 13 A.D.3d 285, 787 N.Y.S.2d 35 (1st Dep't 2004) (same), with Majlinger v. Cassino Contracting Corp., 25 A.D.3d 14, 802 N.Y.S.2d 56 (2d Dep't 2005) (holding that compensating injured undocumented worker for lost United States earnings under state labor law does not conflict with IRCA).
 
 
 [9]
 For example, if New York's Court of Appeals had construed state tort or labor lawnot to afford undocumented aliens lost earnings compensation, that construction would bind this court and obviate the need for federal preemption analysis.
 
 
 [10]
 Under New York law, "[t]he fact that the employment was illegal" does not, by itself, absolve the employer of his duty to provide workers' compensationO'Rourke v. Long, 41 N.Y.2d at 223, 391 N.Y.S.2d at 557, 359 N.E.2d 1347 (noting principle in case of underage employee).
 
 
 [11]
 Any recovery in a third-party tort action obtained by an injured worker who has also received workers' compensation benefits with regard to the same injury is subject to a lien given to the workers' compensation carrierSee N.Y. Workers' Comp. Law § 29(1); Granger v. Urda, 44 N.Y.2d 91, 96-97 & n. 1, 404 N.Y.S.2d 319, 320-21 & n. 1, 375 N.E.2d 380 (1978).
 
 
 [12]
 Under New York law, this factor does not reference the unlawfulness of the work relationship but of the work itselfSee Public Adm'r v. Equitable Life Assurance Soc'y, 192 A.D.2d 325, 325-26, 595 N.Y.S.2d 478, 479 (1st Dep't 1993). Thus, New York tort law would not award lost earnings damages to a person whose personal injuries precluded him from continuing to work as a bookmaker. See Murray v. Interurban St. Ry. Co., 118 A.D. 35, 102 N.Y.S. 1026 (1st Dep't 1907).
 
 
 [13]
 See also H.R.Rep. No. 99-682(I), at 49, as reprinted in 1986 U.S.C.C.A.N. at 5653 ("Sanctions, coupled with improved border enforcement, [are] the only effective way to reduce illegal entry and in the Committee's judgment [they are] the most practical and cost-effective way to address this complex problem."); id. at 52, as reprinted in 1986 U.S.C.C.A.N. at 5656 ("[T]he primary reason for the illegal alien problem is the economic imbalance between the United States and the countries from which aliens come, coupled with the chance of employment in the United States. . . . The committee, therefore, is of the opinion that the most reasonable approach to this problem is to make unlawful the `knowing' employment of illegal aliens, thereby removing the economic incentive which draws such aliens to the United States as well as the incentive for employers to exploit this source of labor.").
 
 
 [14]
 In reaching this conclusion, the court found it necessary to distinguish the facts before it from those inSure-Tan, Inc. v. NLRB, 467 U.S. 883, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984). In that pre-IRCA case, the Supreme Court had held that undocumented workers were covered "employees" under the National Labor Relations Act who could be awarded relief from unfair labor practices by the NLRB. See id. at 891-94, 104 S.Ct. 2803. Nevertheless, for the plaintiffs, who had left the United States, to receive such remedies, it was necessary for them to secure legal re-admittance to the United States. The Court explained: "In devising remedies for unfair labor practices, the [NLRB] is required to take into account another equally important Congressional objectiv[e], — to wit, the objective of deterring unauthorized immigration that is embodied in the INA. By conditioning the offers of reinstatement on the employees' legal reentry, a potential conflict with the INA is thus avoided." Id. at 903, 104 S.Ct. 2803 (internal quotation marks and citation omitted) (second alteration in original). The A.P.R.A. Fuel Oil majority distinguished Sure-Tan by noting that its holding had been interpreted to apply only to awards of backpay to aliens who had left the country, and that undocumented workers remaining in the United States after illegal termination were eligible for backpay. See NLRB v. A.P.R.A. Fuel Oil Buyers Group, Inc., 134 F.3d at 55 ("`The claimants here have never been deported or forced to leave the country to avoid deportation. Thus, there could be no enticement, by offer of employment or back pay, for them to reenter the country illegally.'" (quoting Rios v. Enterprise Assoc. Steam fitters Local Union 638, 860 F.2d 1168, 1173 (2d Cir.1988))).
 
 
 [15]
 Presumably the NLRB concluded that, after having discovered Castro's immigration status, Hoffman would lawfully have fired Castro for being ineligible to work in the United States under federal immigration law
 
 
 [16]
 Four members of the Court dissented from this conclusion, specifically citing the House Committee Report's observation, quotedsupra p. 232, that IRCA was not intended to diminish existing labor law protections. See Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. at 157, 122 S.Ct. 1275 (Breyer, J., dissenting). The majority dismissed this legislative history as "a single Committee Report from one House of a politically divided Congress." Id. at 149 n. 4, 122 S.Ct. 1275. Nevertheless, the dissent observed that NLRB backpay awards to undocumented workers could, in appropriate circumstances, further both federal labor and immigration policies, the former by making clear to employers that "violating the labor laws will not pay," id. at 154, 122 S.Ct. 1275, (Breyer, J., dissenting), and the latter by discouraging unscrupulous employers from taking the risk of hiring "with a wink and a nod those potentially unlawful aliens whose unlawful employment (given the Court's views) ultimately will lower the costs of labor law violations," id. at 156, 122 S.Ct. 1275; see id. at 155, 122 S.Ct. 1275 (noting that denying NLRB the power to award backpay to illegal aliens who are victims of labor law violations "increases the employer's incentive to find and to hire illegal-alien employees"). The majority concluded otherwise, observing that allowing the NLRB to award backpay to illegal aliens would both condone prior IRCA violations — in that case, the undocumented worker's use of fraudulent documents to secure employment — and encourage future violations. See id. at 150-51, 122 S.Ct. 1275 (observing that law required wrongfully terminated worker to mitigate damages, which undocumented alien could not do without "tendering false documents to employers" or "finding employers willing to ignore IRCA and hire illegal workers").
 
 
 [17]
 Given that IRCA makes it illegal to hire undocumented aliens,see 8 U.S.C. § 1324a(a), and mandates criminal penalties for those who knowingly employ such workers, see id. § 1324a(f), termination is effectively required once an employer learns of an employee's undocumented status. See also Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. at 148, 122 S.Ct. 1275 ("[I]f an employer unknowingly hires an unauthorized alien, or if the alien becomes unauthorized while employed, the employer is compelled to discharge the worker upon discovery of the worker's undocumented status.").
 
 
 [18]
 The distinction we identify between the termination inHoffman Plastic and the personal injury in this case cannot be considered novel. For example, the families of undocumented workers who died in the World Trade Center on September 11, 2001, have been allowed to recover personal injury compensation from the special victims fund created by Congress, although the termination of such workers was presumably required by IRCA. See 49 U.S.C. § 40101 note; see also Cara Buckley, With Millions in 9/11 Payments, Bereaved Can't Buy Green Cards, N.Y. Times, Sept. 3, 2006, at A 1 (reporting awards to survivors of illegal immigrant victims in amounts from $875,000 to $4.1 million).
 
 
 [19]
 Hoffman Plastic did not seek to reconcile any actual conflict in statutory language between the NLRA and IRCA. Rather, it considered whether the NLRB, the federal agency charged with NLRA enforcement, exceeded its discretion in awarding backpay in circumstances where that remedy conflicted with IRCA objectives. See generally Chevron U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).
 
 
 [20]
 In contrast to the "clear demonstration of conflict" referenced by Justice Rehnquist inJones v. Rath Packing Co. as necessary to support an inference of federal preemption of state law, in Hoffman Plastic, he observed for the Court that even a "potential" conflict between two federal laws is enough to absolve federal courts of the duty to defer to an administering agency's remedial preferences. See Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. at 144, 122 S.Ct. 1275 ("[W]e have accordingly never deferred to the [NLRB's] remedial preferences where such preferences potentially trench upon federal statutes and policies unrelated to the NLRA.") (emphasis added).
 
 
 [21]
 Several other state and federal district courts have considered the intersection between IRCA and state tort laws in the wake ofHoffman Plastic, with varying results. See generally Flores v. Limehouse, 2006 WL 1328762 (D.S.C. May 11, 2006), 2006 U.S. Dist. LEXIS 30433, at *5-6 (finding no IRCA preemption where undocumented workers had fraudulently obtained employment, and allowing undocumented workers to bring claims against their employer under federal and state labor laws, as well as under the federal Racketeer Influenced and Corrupt Organizations Act); Veliz v. Rental Serv. Corp. USA, Inc., 313 F.Supp.2d 1317, 1336-37 (M.D.Fla.2003) (denying undocumented worker's tort claim where worker had used false identification to obtain employment); Hernandez-Cortez v. Hernandez, 2003 WL 22519678 (D.Kan. Nov.4, 2003), 2003 U.S. Dist. LEXIS 19780, at *17-19 (finding that IRCA and Hoffman Plastic preempted undocumented alien's tort suit for projected earnings lost as a result of car accident); Pontes v. New Eng. Power Co., 18 Mass.L.Rptr. 183, 2004 WL 2075458 (Aug. 19, 2004), 2004 Mass.Super. LEXIS 340, at *6 (ruling, in undocumented worker's tort action against employer, that "[s]ince the focus is on the effect of the work injury on earning capacity[,] the plaintiff's alien status is irrelevant to the inquiry"); Rosa v. Partners in Progress, Inc., 868 A.2d 994, 1001, 152 N.H. 6, 14 (2005) (holding that undocumented worker could recover United States earnings in tort only if employer knew or should have known of worker's illegal status); Balbuena v. IDR Realty LLC, 6 N.Y.3d at 356-63, 812 N.Y.S.2d at 425-30, 845 N.E.2d 1246 (finding no IRCA preemption of New York Scaffold Law where undocumented workers had not presented false documentation to obtain employment); Tyson Foods, Inc. v. Guzman, 116 S.W.3d 233, 244 (2003), 2003 Tex.App. LEXIS 6643, at *24 (rejecting Hoffman Plastic-based challenge to tort award to undocumented alien, and noting that Hoffman Plastic "only applies to an undocumented alien worker's remedy for an employer's violation of the NLRA and does not apply to common-law personal injury damages").
 
 
 [22]
 In adopting this suggestion, the New York Court of Appeals stated:
 Certainly IRCA and related statutes thoroughly occupy the spectrum of immigration laws. But there is nothing in those provisions indicating that Congress meant to affect state regulation of occupational health and safety, or the types of damages that may be recovered in a civil action arising from those laws. To the contrary, the legislative history of IRCA shows that the Act was not intended "to undermine or diminish in any way labor protections in existing law."
 Balbuena v. IDR Realty LLC, 6 N.Y.3d at 357, 812 N.Y.S.2d at 426, 845 N.E.2d 1246 (quoting H.R. Rep. 99-682(I), at 58, as reprinted in 1986 U.S.C.C.A.N. at 5662).
 
 
 [23]
 See Chellen v. John Pickle Co., 446 F.Supp.2d 1247, 2006 WL 2456946 (D.Okla. Aug. 22, 2006), 2006 U.S. Dist. LEXIS 60682, at *67-71; Zavala v. Wal-Mart Stores, Inc., 393 F.Supp.2d 295, 321-25 (D.N.J.2005); Galaviz-Zamora v. Brady Farms, Inc., 230 F.R.D. 499, 501-03 (W.D.Mich.2005); Flores v. Amigon, 233 F.Supp.2d 462, 463-64 (E.D.N.Y. 2002); Singh v. Jutla, 214 F.Supp.2d at 1060-62; Liu v. Donna Karan Int'l, Inc., 207 F.Supp.2d 191, 192 (S.D.N.Y.2002); see also Patel v. Quality Inn S., 846 F.2d 700, 704-06 (11th Cir.1988) (reaching same conclusion before Hoffman Plastic).
 
 
 [24]
 The New York Court of Appeals concluded that, because "IRCA does not make it a crime to work without documentation,"Hoffman Plastic was appropriately limited to its facts, "including the critical point that the alien tendered false documentation that allowed him to work legally in this country." Balbuena v. IDR Realty LLC, 6 N.Y.3d at 360, 812 N.Y.S.2d at 428, 845 N.E.2d 1246. The dissenting judges in Balbuena read Hoffman Plastic more broadly to preclude any award of backpay to an undocumented alien. See id. at 369-70, 812 N.Y.S.2d at 435 (R.S. Smith, J., dissenting). Some language in Hoffman Plastic supports this reading. However, Hoffman Plastic was not a federal preemption case and we cannot infer Congress's manifest intent to preempt state law absent a clear conflict with federal law. Nonetheless, Hoffman Plastic is useful to our preemption analysis primarily in identifying circumstances that can put statutes in conflict. In that case: (1) the termination injury to be remedied through an NLRA backpay award was, in fact, effectively required by IRCA; and (2) the terminated employment relationship had its origins in the employee's criminal violation of IRCA. No similar facts were present in Balbuena, nor are they present in this case.
 
 
 [25]
 The presumption is necessarily hypothetical because workers' compensation benefits are awarded only for the period when the injured employee is actually unable to work
 
 
 [26]
 State courts have not construedHoffman Plastic to mandate preemption of workers' compensation awards to undocumented aliens. See Farmer Brothers Coffee v. Workers' Comp. Appeals Bd., 35 Cal.Rptr.3d 23, 28 (Cal.Ct.App.2005), 2005 Cal.App. LEXIS 1618, at *10 (rejecting IRCA preemption challenge to workers' compensation scheme, and explaining that "California law has expressly declared immigration status irrelevant to the issue of liability to pay compensation to an injured employee"); Safeharbor Employer Servs. I, Inc. v. Velazquez, 860 So.2d 984, 985-86 (Fla. Ct.App., First Dist.2003), 2003 Fla.App. LEXIS 15281, at *1-4; Continental PET Techs., Inc. v. Palacias, 604 S.E.2d 627, 629-31, 269 Ga.App. 561, 562-64 (Ga.Ct.App. 2004); Design Kitchen & Baths v. Lagos, 882 A.2d 817, 825-26, 388 Md. 718, 732-33 (2005); Correa v. Waymouth Farms, Inc., 664 N.W.2d 324, 329 (2003), 2003 Minn. LEXIS 394, at *11-14; Crespo v. Evergo Corp., 841 A.2d 471, 475, 366 N.J.Super. 391, 398 (N.J.Super.Ct.App.Div.2004); Rajeh v. Steel City Corp., 813 N.E.2d 697, 703, 157 Ohio App.3d 722, 731 (2004); Cherokee Indus., Inc. v. Alvarez, 84 P.3d 798, 799-801, 2004 OK Civ.App. 15 (2003); Reinforced Earth Co. v. Workers' Comp. Appeal Bd., 810 A.2d 99, 105, 570 Pa. 464, 474-75 (2002). But cf. Sanchez v. Eagle Alloy Inc., 658 N.W.2d 510, 518-21, 254 Mich.App. 651, 667-73 (Mich.Ct.App. 2003) (denying workers' compensation benefits only after alien's employment status was discovered, where alien had committed crime by submitting false documents to obtain employment).
 Indeed, prior to Hoffman Plastic, many states had already rejected IRCA preemption of their workers' compensation laws. See Champion Auto Body v. Indus. Claim Appeals Office, 950 P.2d 671, 673 (Colo.Ct.App.1997), 1997 Colo.App. LEXIS 253, at *5-6; Dowling v. Slotnik, 712 A.2d at 404, 244 Conn. at 796 [1998]; Gene's Harvesting v. Rodriguez, 421 So.2d 701, 701 (Fla.Dist.Ct.App.1982), 1982 Fla.App. LEXIS 28173, at *1; Artiga v. M.A. Patout & Son, 671 So.2d 1138, 1139 (La.Ct. App.1996), 1996 La.App. LEXIS 770, at *2; Ruiz v. Belk Masonry Co., 559 S.E.2d 249, 252, 148 N.C.App. 675, 679 (N.C.Ct.App. 2002); Mendoza v. Monmouth Recycling Corp., 672 A.2d 221, 224 (N.J.Super.Ct.App.Div.1996), Lang v. Landeros, 918 P.2d 404, 406, 1996 OK Civ.App. 4, at *4-5 (1996); Reinforced Earth Co. v. Workers' Comp. Appeal Bd., 749 A.2d 1036, 1039 (Pa. Commw.Ct.2000), 2000 Pa. Commw. LEXIS 200 at *8. But cf. Tarango v. State Indus. Ins. Sys., 25 P.3d 175, 117 Nev. 444 (2001) (en banc) (upholding workers' compensation benefits for undocumented alien but denying him vocational rehabilitation benefits because latter would violate express terms of IRCA); Granados v. Windson Dev. Corp., 509 S.E.2d 290, 257 Va. 103 (1999) (denying workers' compensation benefits to undocumented workers), overruled by statute, Va.Code Ann. § 65.2-101 (as amended Apr. 19, 2000) (revising definition of "employee" to include "[e]very person, including aliens and minors"); Felix v. State ex rel. Wyo. Workers' Safety & Comp. Div., 986 P.2d 161, 163 (Wyo.1999), 1999 Wyo. LEXIS 128, at *5 (denying workers' compensation to undocumented worker because state statute defined covered employee to include, inter alia, "legally employed ... aliens" (emphasis added)).
 
 
 [27]
 The cases rejecting federal preemption challenges to workers' compensation awards do not generally focus on whether the employer or the undocumented worker violated IRCA in initiating their relationship. Because the challenged award in this case was entered pursuant to New York Labor Law § 240(1), not the state Workers' Compensation Law, we need not consider the effect of an employee's immigration fraud on a workers' compensation claim. In any event, the record in this case makes clear that C & L hired Madeira in knowing violation of IRCA
 
 
 [28]
 To the extent that a presumption of continued work raises questions about an injured undocumented worker's duty to mitigate damages, conduct that would necessitate an IRCA violation by either the alien or his employer,see Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. at 150-51, 122 S.Ct. 1275, we note that the record in this case fails to indicate a mitigation issue at trial, perhaps for reasons discussed in Balbuena v. IDR Realty LLC, 6 N.Y.3d at 361, 812 N.Y.S.2d at 429, 845 N.E.2d 1246 ("Mitigation of damages is not implicated when a worker's injuries are so serious that the worker is physically unable to work."). In any event, we need not factor that unpreserved concern into our analysis of appellants' preemption challenge. See generally Paese v. Hartford Life & Accident Ins. Co., 449 F.3d 435, 446 (2d Cir.2006) ("In general we refrain from passing on issues not raised below.") (internal quotation marks omitted). It may well be that New York will develop a jury instruction to ensure that injured undocumented workers who cannot lawfully mitigate lost United States earnings are not awarded more in damages than workers who can lawfully do so.
 
 
 [29]
 As our concurring colleague notes, courts would benefit from a clearer statement of congressional purpose in this difficult areaSee post at 254-55.
 
 
 [30]
 The § 240(1) cases cited by Affordable and Mountain in their appellate brief are inapposite. Indeed, Affordable's and Mountain's own brief explains why: These cases generally hold that, "upon a finding of absolute liability under § 240 of New York Labor Lawwithout any finding of negligence on the part of the general contractor, an indemnification agreement would not run afoul of the prescriptions of § 5.322.1 of the General Obligations Law that limit indemnity obligations." Cross-Appellants' Br. at 18 (emphasis added). Here, unlike in the cases cited by Affordable and Mountain, in the second phase of trial the jury expressly found Affordable and Mountain negligent and, thus, proportionately liable for Madeira's personal injuries.
 
 
 [31]
 In its Rule 50(b) decision, the district court noted the parties stipulation,see Madeira v. Affordable Hous. Found., Inc., 315 F.Supp.2d at 506, but rejected Affordable's and Mountain's evidentiary claim on the ground that "[t]he issue of whether there was a breach of the insurance clause is irrelevant, because no cause of action for such a breach was alleged," id. at 509. Even if we were to read the third-party complaint otherwise, an appeals court "may affirm the judgment of the district court on any ground appearing in the record." See Boy Scouts of Am. v. Wyman, 335 F.3d 80, 90 (2d Cir.2003).
 
 
 [32]
 Silva argues that the jury's finding that Miranda did not actually sign the construction contract means that the contract was a forgery, and thus voidab initio. Although it is true that a forged contract is invalid, see Oberlander v. Fine Care, Inc., 108 A.D.2d 798, 799, 485 N.Y.S.2d 313 (2d Dep't 1985), the jury did not find that the construction contract was a forgery. On the contrary, it concluded that Miranda, as an authorized agent of C & L, had assented to the contract's terms.
 
 
 JOHN M. WALKER, JR., Chief Judge, concurring:
 
 124
 In the four years since the Supreme Court decided Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. 137, 122 S.Ct. 1275, 152 L.Ed.2d 271 (2002), courts have struggled to reconcile workplace safety and employment laws, at both the state and federal level, with federal immigration policy — to little avail. This case is no easier than those that have come before; it requires us to decide whether the Immigration Reform and Control Act (IRCA) implicitly preempts New York's "scaffold law," which entitles an illegal alien employee to recover for losses suffered on account of an employer's failure adequately to maintain safe working conditions. Although I have no qualms about deciding tough cases, and join Judge Raggi's careful and thorough opinion disposing of this one in full, I write separately to emphasize my concern that Congress has left it to judges to make policy decisions of the sort this case requires.
 
 
 125
 While discerning so-called "conflict preemption," see generally Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941), is a difficult task in the best of times, see, e.g., Geier v. American Honda Motor Co., 529 U.S. 861, 887-88, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000) (Stevens, J., dissenting), Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 390-91, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) (Scalia, J., concurring), judges are especially ill-suited to divining the unexpressed will of Congress when it comes to hot-button and ever-shifting issues like immigration policy. Courts should not have to guess how often and to what extent employers and their illegal alien employees will break the law in order to decide a case. Cf. Geier, 529 U.S. at 883, 120 S.Ct. 1913 ("assum[ing] compliance with the . . . law duty in question" without speculating concerning likely actual behavior). Courts should not have to decide whether state legislatures transgress federal immigration policy by requiring employers, say, to provide vocational rehabilitation services to injured illegal aliens, cf. Tarango v. State Indus. Ins. Sys., 117 Nev. 444, 25 P.3d 175 (2001), or whether state tort principles that require injured alien employees to mitigate damages conflict with IRCA, cf. Reinforced Earth Co. v. Workers' Comp. Appeal Bd., 570 Pa. 464, 810 A.2d 99, 108-09 & n. 12 (2002). And surely courts should not have to render paradoxical decisions such as holding that an illegal alien only becomes lawfully entitled to U.S. wages when he is physically incapable of earning them. Cf. Rosa v. Partners in Progress, Inc., 152 N.H. 6, 13, 868 A.2d 994 (2005).
 
 
 126
 Nevertheless, we must decide this case. Because Hoffman Plastic was a fact-specific, policy-driven decision, see, e.g., Hoffman Plastic, 535 U.S. at 150, 122 S.Ct. 1275; id. at 155-56, 122 S.Ct. 1275 (Breyer, J., dissenting), I cannot say that it is controlling here; I cannot confidently assert, see Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977), that IRCA preempts New York law under circumstances such as those presented here, where the employer, not the employee, has violated IRCA and where the state seeks to exercise its historic police powers. See Balbuena v. IDR Realty LLC, 6 N.Y.3d 338, 812 N.Y.S.2d 416, 845 N.E.2d 1246 (2006).
 
 
 127
 Yet this is a close case. Congress did not intend to "compromise [IRCA's] . . . effectiveness by deference to every provision of state statute or local ordinance." See Crosby, 530 U.S. at 376, 120 S.Ct. 2288 (2000); see also Farmer Bros. Coffee v. Workers' Comp. Appeals Bd., 133 Cal. App.4th 533, 35 Cal.Rptr.3d 23, 29 (Ct. App.2005). And whatever its policy implications, Hoffman Plastic did resolve a circuit split concerning the relative importance of legal eligibility to work, see Del Rey Tortilleria, Inc. v. NLRB, 976 F.2d 1115, 1119 (7th Cir.1992) (holding that aliens "had no right to be present . . . and consequently had no right to employment") (emphasis added), and physical eligibility to work, see NLRB v. A.P.R.A. Fuel Oil Buyers Group, Inc., 134 F.3d 50, 54-55 (2d Cir.1997) (arguing that "`Sure-Tan gave no indication that it was overruling a significant line of precedent that disregards a discriminatee's legal status, as opposed to availability to work'") (emphasis added) (quoting Local 512 v. NLRB, 795 F.2d 705, 717 (9th Cir.1986)).
 
 
 128
 One way for New York to diminish the conflict between its workplace safety laws and immigration policy might be to ask juries to calculate lost future wages based on the likelihood that the illegal alien will obtain authorization to work, rather than the likelihood that the illegal alien will evade immigration enforcement agencies. Cf. A.P.R.A. Fuel, 134 F.3d at 62 (Jacobs, J., dissenting) ("It is possible . . . to give full play to the labor laws as well as to the immigration laws by an award of backpay commencing on the date that the alien obtains authorization to work in the United States."); Rodriguez v. Kline, 186 Cal. App.3d 1145, 232 Cal.Rptr. 157, 158 (1986). But that is simply one judge's view. It would be far better for the 535 members of Congress to express theirs.